**UNITED STATES of America**
**v.**
**Johnnie BUSH, Jr., Appellant.**
**No. 22338.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 29, 1969.
Decided Aug. 15, 1969.

---

6. *Id.*, 395 U.S. 267, 89 S.Ct. 1687.

--------

Mr. William R. Glendon, Washington, D. C., with whom Mr. Anthony F. Essaye, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. David C. Woll, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, and Harold H. Titus, Jr., now Principal Asst. U. S. Atty., were on the brief, for appellee. Mr. Robert S. Bennett, Asst. U. S. Atty., also entered an appearance for appellee.

Before WRIGHT, LEVENTHAL and ROBB, Circuit Judges.

ROBB, Circuit Judge.

The appellant was convicted, in a trial by jury, of second degree murder (22 D.C.Code § 2403) and carrying a pistol without a license (22 D.C.Code § 3204). He was sentenced to imprisonment for not less than nine or more than twenty-one years on the first count and one year on the second count, the sentences to run concurrently. On this appeal he does not challenge the judgment on the second count, but contends that the District Court should have granted his motion for judgment of acquittal on the charge of second degree murder, made at the end of the government's case and renewed at the close of the evidence. The ground of the appellant's motion was that the proof affirmatively demonstrated that he acted in self-defense, or that the evidence at least created a reasonable doubt as to his guilt. We agree with the appellant.

The evidence at trial disclosed that the appellant shot and killed one Bellamy in a bar, known as Jazzland Restaurant. The shooting was the culmination of a dispute between the appellant and Bellamy over a wristwatch. It appeared that the appellant had borrowed the watch from the manager of the bar for the purpose of inspecting it. The appellant passed the watch to another patron of the bar, one Ernie, who also wished to examine it, and Ernie in turn handed the watch to Bellamy. Preparing to leave the bar, and wishing to return the watch to its owner, the appellant asked for it. When Bellamy failed to hand over the watch the dispute and shooting followed.

A number of witnesses, patrons or employees of the bar, testified on behalf of the government. There was agreement among several that a dispute or "argument" over a watch had taken place between the appellant and Bellamy, that the appellant demanded the watch and Bellamy either refused to give it to him or denied that he had it.

Only one government witness, however, testified that he saw the shooting and the actions of the appellant and Bellamy that immediately preceded it. According to this witness, one Jones, he noticed that the appellant and Bellamy, who were seated at the bar, were "passing words". Jones paid no particular attention until he heard someone say "don't do that" at which point he turned around and saw Bellamy with a steel bar stool gripped in both his hands, facing Bush who was standing with his back to Bellamy. Bush turned around when he heard the words "don't do that", and Bellamy then advanced towards Bush, menacing him with the heavy stool. Bush backed up. When they were about four feet apart Bush drew a gun and pointed it at the floor, and "kept telling the guy to stay away from him with that stool". Bellamy continued to advance and while still retreating Bush fired one or two shots into the floor. Bellamy then "came towards him faster" and Bush shot him. Finally, Bellamy dropped the stool, grappled with Bush and held him in a bearhug for some moments before falling to the floor. Although the government attempted to impeach the testimony of the witness upon the basis of his statement to the police, which in one respect appeared to be in conflict with his testimony, Jones adhered to his testimony as originally given on the witness stand.

Other patrons of the bar, called as government witnesses, had not observed the actions of Bellamy and Bush just before the shooting, but two witnesses testified that they saw Bellamy holding up a bar stool. Two witnesses confirmed that Bush was "backing up". With respect to appellant's actions after the shooting the government's proof was to the effect that he placed his gun —a .22 caliber revolver—on the bar, asked that the police be called, remained on the premises until they arrived, then voluntarily identified himself as the person who had done the shooting. The manager of Jazzland testified that when

he observed Bellamy's body immediately after the shooting, he saw his wristwatch on Bellamy's arm. The coroner's autopsy disclosed that although "medically" the deceased was sober when he was shot, there was an appreciable amount of alcohol in his blood. There were powder smudges around one bullet hole in the sweater worn by the deceased, indicating that this shot had been fired at close range.

His motion for judgment of acquittal at the close of the government's case having been denied, the appellant took the stand. His version of the shooting was in substantial accord with that given by Jones, the government witness. According to the appellant he turned around at the cry "don't do that" to find that Bellamy was menacing him with an upraised, heavy steel bar stool. As Bellamy approached him the appellant backed up, telling Bellamy "not to come up on" him. Bellamy "kept coming". Still backing up, and repeating his admonition to Bellamy, the appellant drew his gun and fired a shot into the floor. Bellamy continued to advance, and the appellant, backing up further, shot again into the floor. Bellamy then accelerated his pace and finally, when the appellant had backed up almost to a jukebox against the wall, the appellant shot him. Even after the shooting Bellamy grappled with the appellant in a bearhug, lifting him off the floor against the jukebox and tearing his coat. When Bellamy loosened his grip and fell, the appellant, who was "shaking so bad and so nervous" put his gun on the bar, and asked that the police be called. Significantly, the government in rebuttal failed to offer any evidence to show that there were in fact no bullet holes in the floor.

We hold that on such evidence the jury could not reasonably find that the appellant exceeded the bounds of lawful self-defense. Such a finding must have been based upon speculation, surmise and the repudiation by the government of the case made by its own witnesses. Curley v. United States, 81

U.S.App.D.C. 389, 160 F.2d 229, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947); *cf.* Cephus v. United States, 117 U.S.App.D.C. 15, 324 F.2d 893 (1963). The government argues that the appellant might have asked for assistance, or retreated in some other way, or countered Bellamy's attack by picking up another bar stool. Similar arguments were advanced in Brown v. United States, 256 U.S. 335, 41 S.Ct. 501, 65 L.Ed. 961 (1921), and rejected by the Supreme Court. In that case Mr. Justice Holmes observed (256 U.S. at 343, 41 S.Ct. at 502):

> "Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore in this Court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him."

We think it is likewise true that detached reflection cannot be demanded in the presence of an uplifted steel bar stool. The case should not have gone to the jury on the first count of the indictment.

■ The appellant also complains of the trial court's instruction on malice, which was in the language of Standard Criminal Jury Instruction No. 83 [1]. We find no prejudicial error in this respect. We believe, however, that it would be well in future cases to eliminate the implication in the standard charge that any violation of "social duty" or "duty", even though not dangerous to life or limb, may be equated to malice. This implication could be eliminated by charging as follows:

> "Malice" does not necessarily imply ill will, spite, hatred, or hostility by the defendant toward the person killed. "Malice" is a state of mind showing a heart regardless of the life and safety of others, a mind deliberately bent on mischief, a generally depraved, wicked and malicious spirit. "Malice" may also be defined as the condition of mind which prompts a person to do willfully, that is, on purpose, without adequate provocation, justification, or excuse, a wrongful act whose foreseeable consequence is death or serious bodily injury to another.

As already noted, appellant's conviction on the second count of the indictment, charging that the appellant carried a pistol without a license, is not challenged on appeal. The judgment on the first count only is reversed.

So ordered.

---

1. "Malice" does not necessarily imply ill will, spite, hatred or hostility by the defendant toward the person killed. "Malice" is a state of mind showing a heart regardless of social duty, a mind deliberately bent on mischief, a generally depraved, wicked and malicious spirit. "Malice" may also be defined as the condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose, to the injury of another, or to do intentionally a wrongful act toward another without justification or excuse. Criminal Jury Instructions for the District of Columbia No. 83 at 62 (Junior Bar Section, The Bar Association of the District of Columbia, 1966).