**UNITED STATES of America,**
**Appellee,**

v.

**Wilbur JONES, Appellant.**

**No. 72-1479.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 26, 1973.

Decided July 16, 1973.

Rehearing Denied Aug. 22, 1973.

748

Nathaniel P. Breed, Jr., Washington, D. C., with whom Robert Reed Gray, Washington, D. C., (both appointed by this court) was on the brief, for appellant.

Richard L. Beizer, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Jerome Wiener, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and VAN PELT*, United States Senior District Judge for the District of Nebraska.

VAN PELT, Senior District Judge:

This case comes before the court upon appeal from a judgment of conviction for manslaughter following a jury verdict of guilty. Appellant was sentenced to a term of not less than two years and not more than six years imprisonment.

The events which led to the indictment of Appellant on a charge of second degree murder occurred on April 14, 1971. Appellant was at the home of his common law wife, Mrs. Estelle M. Henderson. Betty Henderson, an eleven year old daughter of Mrs. Henderson, told Appellant that some men were tampering with cars, including a car owned by Appellant, parked in a vacant lot across the alley from the back yard of the house. He took a loaded shotgun which he kept in the house and proceeded to the back yard. He told the men to leave his car alone, but received an abusive reply. Shortly thereafter Appellant fired the shot which killed the victim. He then left the house taking the two youngest children.

Appellant testified in his own defense. He stated that when Betty told him of the men, he looked through the rear window and saw three men. He recognized one of the men as an individual who had robbed and assaulted him a month earlier. He told one of the children to call the police, took his shotgun and went into the back yard with the gun partially concealed with a blanket. He asked the men to leave and threatened to call the police, but the men replied with abusive language. He did not show the shotgun, but rather turned to reenter the house. When he was on the steps of the porch at the rear of the

house, he glanced over his shoulder and saw one of the men reach for a pistol. He turned, fired blindly and reentered the house. He saw one of the two remaining men take the pistol with them. Appellant told the oldest child to call the police and an ambulance, left the house with the two youngest children, and drove to an apartment rented by him in order to pick up a sum of money. On the way to the apartment, he went to the Anacostia River and threw the shotgun into the river. He testified that he did this because of his confused mental state. Later, he turned himself in to the police.

The police testified that they found a pair of pliers under the victim but no weapon. They also found an expended shotgun shell in the middle of the back yard some forty-one feet from the victim.

Betty Henderson testified that she did not see the shooting, but that she did see the victim about to fall when she looked out the back window [there was a conflict in her testimony as to where she was when she looked into the back yard] and saw that as he was falling he had no weapon.

The oldest child, twelve year old Annie, also testified, and it is around her testimony that much of the controversy in the instant case revolves. Prior to the trial she told the prosecutor that the victim did not have a gun. She told a defense investigator that the victim did have a gun. At the trial she related both versions.

▮ Appellant argues [1] that certain errors occurred in the proceedings below which are sufficient, standing alone, to warrant reversal by this court. In addition, Appellant argues that the cumulative effect of these errors warrants reversal [2] even if the errors standing alone are considered harmless.

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(d) (1970).

1. Appellant also argues that the lower court erred in not granting his motion for acquittal. We hold that the trial

court did not err in this respect. *See* note 18, *infra,* and accompanying text.

2. This court has indicated that although certain errors standing alone might be insufficient to overturn a verdict, these

## INSTRUCTIONS

■ ■ Two of the alleged errors involve instructions given by the trial court. After four hours of deliberation the jury sent a note asking for an explanation of the manslaughter charge. The trial court viewed this as a request for a repetition of the charge and thus proceeded to reinstruct the jury. The court admonished the jury that "they must recall all of the other instructions the Court has given . . ., instructions with respect to reasonable doubt and self defense. . .. . You can assume that I have repeated all of those matters to you at this time and I will simply at this time discuss the elements of manslaughter." There was no request for, and the trial court did not repeat, the self-defense instruction. Appellant argues this was plain error under Rule 52(b).

The trial court gave an instruction on flight and concealment.[3] Appellant argues that this, too, was plain error under Rule 52(b).

No objection was raised by defense counsel as to either of these instructions when given. Although it is true that under certain circumstances each charge might be the subject of criticism,[4] there is nothing in the record to justify calling the court's instructions plain error,[5] either standing alone or in conjunction with other alleged errors.

## TESTIMONY OF ANNIE HENDERSON

Appellant further argues that the trial court erred in failing, *sua sponte*, to strike the testimony of Annie Henderson.[6] An understanding of this issue is impossible without a detailed review of the girl's testimony. After examination, the court was satisfied that Annie was competent to testify and so held. After several preliminary questions the prosecutor asked Annie "whether the [victim] had anything at all in either one of his hands." Twice she shook her head to indicate "no." When, however, the court asked Annie

errors may exert a cumulative effect such as to warrant reversal. The critical inquiry is an analysis of the "probable impact, appraised realistically, of the particular [errors] upon the jury's fact-finding function." United States v. Wharton, 139 U.S.App.D.C. 293, 299, 433 F.2d 451, 457 (1970).

3. The instruction given was as follows:
"Flight and concealment does not give rise to a presumption of guilt. You may not find the Defendant guilty of either murder in the second degree or manslaughter because of flight and concealment alone. You may consider evidence of flight and concealment, however, as circumstances tending to prove consciousness of guilt, depending, of course, upon your appraisal of the proof as a whole.
"Now, you ought to approach this aspect of the case with great caution. If you accept the Defendant's explanation as credible, it will affect the weight that you are to give the entire question. If you are in doubt, you need not consider flight or concealment at all, one way or the other, in reaching your verdict.
"Now, your own common sense will, I am sure, assist all of you in weighing this matter of flight and concealment.

Obviously, experience teaches that sometimes innocent people, caught in a web of incriminating circumstances, may become frightened and flee or conceal. Flight or concealment may be prompted by a variety of motives other than guilt and may be an extremely complex reaction. Obviously, experience also teaches that sometimes people who commit crimes and are conscious of their guilt fear apprehension and may flee and conceal to avoid being held responsible. It is for you in this case to decide what weight if any to give flight and concealment, after weighing all the other proof and including the extent and nature of the flight and concealment, the circumstances under which it occurred, and all explanations mentioned or suggested by the Government and the Defendant in the light of the proof as a whole."

4. *See e. g.*, United States v. Telfaire, 152 U.S.App.D.C. 146, 469 F.2d 552 (1972).

5. Fed.R.Crim.P., 30, 52.

6. The uncertain testimony of this witness is also referred to in Appellant's arguments concerning the sufficiency of the evidence and the alleged prosecutorial misconduct.

to speak up and "tell the jury what [she] saw," the following took place:

"The Witness: A gun.

The Court: In whose hands?

The Witness: In the man hands laying [*sic*] down.

By Mr. Wiener: [Government prosecutor],

Q. Who had the gun?

A. A man, that was laying [*sic*] down."

The court then permitted the Government to cross-examine the witness. The Government elicited from Annie the statement that the victim had the gun tucked in his belt and was reaching for it when he was shot. Annie was asked about a written statement she had given the police concerning the incident and she admitted making statements contained therein. This written statement did not deal with whether the man had a gun when shot. The prosecutor then asked Annie about an oral statement she had made to him, during a pre-trial interview, that the man did not have a gun. Annie admitted making the statement but testified that she had not told him the truth. Upon further questioning the witness again changed her testimony and stated that she had told him the truth about the absence of a gun.

The following colloquy then took place between the court and the witness:

"The Court: Young lady, you have said two things now. You have said one time that the man had a gun, and another time you have said he didn't have a gun.

Will you take your hands down from your mouth. You tell the jury which it is. Did he have a gun or did he not have a gun?

The Witness: Tell the jury?

The Court: Tell the truth. Did he have a gun or did he not have a gun?

The Witness: He did not have a gun."

On cross-examination the witness stated that she had not understood the questions asked by the Police, but that she had understood her written statement. She also testified that she had had an interview with a Legal Aid investigator, to whom she had stated that the victim had a gun.

On re-direct the witness nodded assent when asked whether she had told the truth when she had stated that the victim had no gun.

On re-cross the witness stated that she had lied to the prosecutor but had told the truth to defense counsel.

This recitation of the testimony reflects the obvious difficulties in ascribing any weight to Annie's testimony and tends to support Appellant's argument that the self-contradictory nature of the testimony renders it without probative value.[7] In analyzing this testimony, we are dealing with the matters of competency and credibility, matters which are normally within the province of the trial court and the jury, respectively. As to competency, this court has said that "whether a person is legally competent to testify as a witness is a matter that rests largely within the discretion of the trial court," and this discretion will not "be disturbed except where 'clearly erroneous.'"[8] Indeed, it has become the modern trend to limit even the trial court's power to exclude testimony because of incompetency and to make the pivotal question one of credibility:

"The liberalization that has been accomplished in the practice has come by liberalization in judicial custom, as the statutes have seldom purported to change the common law standard.

7. The trial judge recognized this difficulty when he commented, out of the presence of the jury: "With respect to [Annie's] testimony, it has very little probative value of any shape or description."

8. United States v. Hardin, 143 U.S.App.D. C. 320, 322, 443 F.2d 735, 737 (1970).

Disqualification for mental capacity or immaturity would doubtless have long since been abandoned, except for the presence of the jury as the trier of facts. The judges distrust a jury's ability to assay the words of a small child or of a deranged person. Conceding the jury's deficiencies, the remedy of excluding such a witness, who may be the only person available who knows the facts, seems inept and primitive. Though the tribunal is unskilled, and the testimony difficult to weigh, it is still better to let the evidence come in for what it is worth, with cautionary instructions." [9]

■ It seems clear, however, that this Circuit has not gone so far as to hold, in line with this modern trend, that the question of competency should be relegated to such a minor role. The test for competency of a child witness "depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as of his duty to tell the former." [10] And in United States v. Hardin, 143 U.S.App.D.C. 320, 443 F.2d 735 (1970), this court indicated a willingness to examine the subsequent testimony of a child witness in order to test the continuing validity of the original competency determination. In that case the testimony of the child "was logical, responsive, internally consistent and in no way indicate[d] that he did not have the necessary intelligence to testify as to what he observed." Id., 143 U.S.App.D. C. at 322, 443 F.2d at 737. Annie Henderson's testimony was not consistent.

■ The facts here, then, lead to a conflict between the trend toward limit-

ing the importance of competency determinations, and the long-standing rules concerning the competency of children and the mentally incapable. However, the events at trial convince us that the trial court committed no prejudicial error in failing to strike, *sua sponte*, the testimony of the child. Defense counsel did not ask for an instruction on competency or ask to have the testimony stricken. On the contrary, counsel used the testimony to full advantage in closing argument in emphasizing the favorable aspects of Annie's testimony and suggesting that the unfavorable aspects were the result of the subtle coercion of figures of authority during pre-trial interviews of the witness. The trial court was faced with a difficult question of competency but, in the absence of objection, proceeded to allow the testimony to be considered by the jury for whatever it was worth. If it was error, under the circumstances, it was harmless.[11]

## PROSECUTORIAL MISCONDUCT

Appellant also argues that the prosecutor engaged in impermissible and prejudicial advocacy in his closing arguments in the following incidents:

(1) The prosecutor stated that after Annie had testified that the victim had a gun she reverted to the story she had told the police in an interview that there was no gun. The prosecutor then characterized her testimony on cross-examination as follows: "Then defense counsel got up and questioned and she went back and vacillated back and forth as to whether the man had a gun or not."

(2) In discussing Appellant's testimony, the prosecutor emphasized alleged

9. C. McCormick, Evidence § 62 (2d ed. 1972). The proposed Rules of Evidence for the United States District Courts and Magistrates reflect this viewpoint in Rule 601, "Every person is competent to be a witness except as otherwise provided in these rules." The Advisory Committee's Notes make this clear:

"No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application.

. . . Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence."

10. Beausoliel v. United States, 71 App.D.C. 111, 107 F.2d 292 (1939).

11. See Fed.R.Crim.P., 52.

inconsistency between this testimony and that of Annie.

(3) The prosecutor stated that he personally disbelieved Appellant. This statement was followed by the trial court's admonition to the jury that "the opinions of counsel with respect to these matters are not of your concern. Counsel can argue only the facts."

(4) The prosecutor described Appellant as the victim's "executioner."

(5) The prosecutor referred to Annie's written statement, which had not been introduced into evidence but which had been discussed before the jury, in his closing argument.

In considering the propriety of a prosecutor's closing argument, we are guided by the oft-repeated admonition of the Supreme Court in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L. Ed. 1314 (1934), that the prosecutor may "strike hard blows", but not "foul." Admittedly this is an ambiguous standard. Each case must be considered separately.

[6] We hold that the use of the term "executioner" does not warrant reversal although we do not condone its use in counsel's argument. Perhaps counsel for the Government should be reminded of this court's statement in Taylor v. United States, 134 U.S.App.D.C. 188, 189, 413 F.2d 1095, 1096 (1969):

"We need not characterize the prosecution argument here as foul to conclude that the prosecution has an obligation to set an example of professional conduct. The Government may prosecute vigorously, zealously with hard blows if the facts warrant, for a criminal trial is not a minuet. Nevertheless, there are standards which a Government counsel should meet to uphold the dignity of the Government.

The language of the prosecutor here was hardly in keeping with what the Courts and the public expect of its representatives. We take this occasion to remind the bar, prosecutors and defense counsel alike, that we expect—indeed insist—that their conduct reflect that they are officers of the court as well as advocates for a cause."

■ ■ It is equally incumbent on counsel to confine his remarks in summation to facts which are in evidence and the reasonable inferences therefrom.[12] In referring to Annie's prior statements the prosecutor noted:

"Remember when we tested her credibility, we went back and I asked her about the statements she had initially given to the police when she hadn't said anything about the man having the gun. And then I asked her about coming to my office and I always told her to tell the truth and what she said to me. She came around then and she then said, after thinking it over and over, he had nothing in his hands, he didn't have a gun."

This does come close to inviting the jury to use the prior statements as substantive evidence contrary to the rule in this circuit.[13] However, the statement of the prosecutor did involve matters which were in evidence through Annie's own testimony when the prosecutor was permitted by the trial court to cross examine.[14] Thus the rule of Johnson v. United States, 121 U.S.App.D.C. 19, 21, 347 F.2d 803, 805 (1965), that "counsel may not premise arguments on evidence which has not been admitted" is inapposite.

■ The prosecutor was also within permissible bounds in discussing the al-

12. United States v. Jenkins, 140 U.S.App. D.C. 392, 436 F.2d 140 (1970); United States v. Jones, 140 U.S.App.D.C. 1, 433 F.2d 1107 (1970).

13. Jones v. United States, 128 U.S.App. D.C. 36, 385 F.2d 296 (1967). Compare the proposed Rules of Evidence for the

United States District Courts and Magistrates, Rule 801(d)(1). The trial court did caution the jury in this regard.

14. *Cf.* United States v. Marcello, 423 F.2d 993 (5th Cir.), cert. denied, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).

leged inconsistencies between portions of Annie's testimony and that of Appellant. We find no rule of law which would prevent a challenge of Appellant's testimony in this manner, despite the obvious weaknesses of Annie's testimony.

■ The prosecutor's statement concerning Annie's vacillation, has elements of truth but could be misleading. Annie did indeed vacillate in her testimony. However, the statement of the prosecutor gives the impression that Annie's testimony during cross-examination was vacillating. Here again defense counsel made no effort to correct this impression. We hold that this too amounts to harmless error and may have been the result of trial tactics.

■ Finally, we have the prosecutor's statement that he personally disbelieved the Appellant, followed by the court's admonition to the jury to disregard opinions of counsel. This represents an obvious transgression, as this court has pointed out time and again in prior cases. *See, e. g.,* United States v. Dews, 135 U.S.App.D.C. 185, 417 F.2d 753 (1969); Gass v. United States, 135 U.S.App.D.C. 11, 416 F.2d 767 (1969); Harris v. United States, 131 U.S.App.D.C. 105, 402 F.2d 656 (1968). It is also true that counsel's failure to ·object is not dispositive, "especially since objection cannot always procure realistic cure for damage." United States v. Young, 150 U.S.App.D.C. 98, 104, 463 F.2d 934, 940 (1972). Nor does the fact that the jury was cautioned by the trial court necessarily foreclose reversal. As this court noted in King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1966), "where the case is close, prejudice cannot be avoided by 'mild judicial action', and reversal is necessary to obviate the consequences of prosecutor's persistent departure from his 'duty to refrain from improper methods' to ob-

tain conviction." [15] The question, however, is one of degree, and in regard to the allegations of prosecutorial misconduct in the instant case we cannot hold that the misconduct of the prosecutor was "so persistent and prejudicial" as to warrant reversal.

■ ■ We realize that "whether improper conduct of Government counsel amounts to prejudicial error depends, in good part, on the relative strength of the Government's evidence of guilt." Jones v. United States, 119 U.S.App.D.C. 213, 338 F.2d 553 (1964). And it is quite evident that the Government's case here, on the critical issue of self defense, was rather weak. Our inquiry must be directed to ascertaining the impact of the misconduct on the fairness of the trial. In the context of this case, Appellant's argument concerning prosecutorial misconduct raises similar considerations as his argument that the cumulative effect of numerous errors, errors which are individually insufficient to warrant reversal, requires reversal. To this argument we now turn.

The evidence presented by the Government was sufficient to raise a jury question of guilt. At the close of the prosecution's case there was evidence that Appellant left the house armed with a loaded shotgun after being told that some men were tampering with his car, that he talked to the men and received an abusive reply, that he thereafter fired a shot from about forty feet which struck the victim and was the cause of death, that when the victim fell he was holding no weapon, and that no other weapon was found near him.[16] Appellant's testimony provided an admission of the shooting, his recognition of one of the men, the flight, and the disposal of the shotgun. The critical issue was self defense. There was evidence that the fatal shot was purposeful rather than

---

15. It should be noted that the *King* holding was a result of an exaggerated example of prosecutorial misconduct, involving the prosecutor's persistent and gross mischaracterization of certain psychiatric testimony.

16. This is the evidence wholly apart from Annie's testimony.

wild, that there was no other weapon, and that Appellant fled leaving others behind, all of which could be considered by the jury as being inconsistent with Appellant's claim of self-defense. The jury, of course, was not required to believe Appellant's testimony about the incident,[17] including the statement that the victim reached for a pistol.

We have juries to make decisions such as this one. Guilty beyond a reasonable doubt was the jury's verdict. While defendant did not have a perfect trial, we conclude that he had a fair trial. In addition, the errors noted above are harmless in a cumulative sense also, for in relying on the standard of the impact of the jury, we feel that the record supports the conclusion that the jury was not prejudicially influenced thereby.[18]

We affirm the judgment of conviction and sentence.

BAZELON, Chief Judge, dissenting:

As the majority recognizes, "it is quite evident that the Government's case here, on the critical issue of self defense, was rather weak." For that reason I am "unable to say with fair assurance that the verdict was not swayed" by the cumulative effect of the errors at trial. United States v. Wharton, 139 U. S.App.D.C. 293, 433 F.2d 451, 461 (1970).

---

17. Nor does the instant case run afoul of the holding in United States v. Bush, 135 U.S.App.D.C. 67, 416 F.2d 823 (1969), because the Government's evidence did not establish in an uncontradicted way Appellant's claim of self defense.

At the conclusion of the defense case, defense counsel renewed his motion for judgment of acquittal. The trial court reserved judgment on the motion, but indicated to counsel the possible analogy between the instant case and *Bush*. The following day the defense counsel again made the motion, but the trial court denied it, distinguishing *Bush* on the grounds we have stated.

18. In considering the question of cumulative impact we have reached the following conclusions. The alleged errors associated with Annie Henderson's testimony are inconsequential both because of its obvious lack of much probative value and because

of its utilization by defense counsel in closing argument. However, the prosecutor's actions in calling Appellant an "executioner" and in expressing personal disbelief in his testimony are more serious because of the importance of Appellant's credibility in relation to his claim of self defense. Although prosecutors should be discouraged from resorting to crude name calling, we cannot conclude that this name calling had significant impact in this case. *Cf.* United States v. James, 151 U.S.App.D.C. 304, 466 F.2d 475 (1972); United States v. Jenkins, 140 U.S.App. D.C. 392, 436 F.2d 140 (1970). The prosecutor's expression of personal disbelief was followed immediately by the trial court's cautionary instruction to the jury. Finally, there was evidence sufficient to negate the claim of self-defense. Under such circumstances it is clear that the cumulative impact of the errors below does not warrant reversal.