## UNITED STATES of America
### v.
## Mamie E. PERKINS, Appellant.
## No. 71–1804.

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1973.

Decided May 28, 1974.

---

Robert A. Gerard, Washington, D. C. (appointed by this court) for appellant.

Lee Cross, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before LEVENTHAL and Mac-KINNON, Circuit Judges, and WYZAN-SKI,* United States Senior District Judge for the District of Massachusetts.

LEVENTHAL, Circuit Judge:

Appellant was arrested on October 5, 1969, and charged with manslaughter. An indictment filed December 30, 1969, charged second-degree murder.[1] A jury trial held in June, 1971, led to a verdict of guilty, and on September 22 appellant

was given a sentence of 1 to 20 years. We vacate the judgment and remand for resentencing for manslaughter, unless the Government requests and the court orders a new trial.

## I. FACTS

We abbreviate our statement of the facts so as to focus on the problem area of the case, the instructions to the jury —particularly those on malice and self-defense. On Sunday, October 5, 1969, appellant fired three shots from her revolver at Jimmy L. Dupree ("Honey") in the kitchen of his parents' house, where appellant rented a room. The deceased had come there the previous morning to eat. When admittance was denied him by his parents, apparently because he was drunk, he broke the latch on the back screen door and came into the kitchen. Appellant tried to stop him and was cut on the thumb by his knife. She testified that he had cut her during a struggle; government witnesses testified that the cutting appeared accidental. The police, responding to a call, directed the deceased to leave the house and told appellant to call them if he should return.

Next day, Sunday, Dupree returned to the house.

Appellant testified that the decedent's father had told her not to allow the decedent in the house, but that Dupree pushed her when she carried the trash outside. According to appellant's account, disputed by government witnesses, deceased took out a knife, and pushed her aside. She went to her room, and when she returned to the kitchen she found him cooking food there, in disregard of instructions. He again brandished a knife, and when she asked him to leave, he approached her. When he came close to her, she fired her gun three times.

## II. RECONSTITUTING THE INSTRUCTION ON SELF-DEFENSE

Appellant's brief on appeal contended, *inter alia*, that the instructions erroneously failed to explain that the claim of self-defense may be sustained, even though the defendant used more force than would have seemed necessary or reasonable to a person considering the

---

\* Sitting by designation pursuant to Title 28, U.S.C. § 294(d).

1. 22 D.C.Code § 2403.

matter afterward, if a belief as to the need for such force was actually and reasonably entertained by the defendant in the heat of passion. He relied on Perry v. United States, 137 U.S.App.D. C. 260, 262, 422 F.2d 697, 699 (1969) and Inge v. United States, 123 U.S.App. D.C. 6, 356 F.2d 345 (1966).

On October 20, 1972, after appellant's brief was filed, the Government filed in the District Court a motion to correct the record. Subsequently, a corrected record of the jury charge was certified to this court by the trial court. With this correction, appellant's *Inge-Perry* claim evaporated. However, problems underlying this correction were identified in appellant's reply brief, filed February 28, 1973, which argued that there was no accurate record on appeal.

The following picture emerged from appellant's reply brief and oral argument. Appellate counsel was appointed on January 18, 1972. His efforts to obtain a full transcript from the reporter, Ernest Black, were unavailing. Finally, following an order of this court, a substitute reporter, Laura Ruff, was retained to transcribe Black's stenographic notes, and a transcript was filed in August, 1972. Appellant's brief was filed September 18.

A Government motion of October 12 for correction of the transcript pages 33–34 (portions of the charge) resulted in a District Court order, dated October 25, 1972, for retranscription of those pages within 10 days. There was a delay by Ms. Ruff, and the Government moved this court for extension of time to file its brief. On January 12, 1973, the Government filed in District Court a second motion to correct the record, this time pages 19–35 of the transcript. This motion was granted and on January 17, 1973, the District Court certified a "reconstructed" charge.

However, the underlying correspondence strongly suggested that with respect to some of the jury instructions, the reporter did not take down what the judge actually said in the courtroom, intending instead to copy the pertinent parts of the judge's standard charges at a later time.

After oral argument this court entered an order remanding the record for further proceedings. Our accompanying memorandum stated:

The record indicates that there may have been substantial errors in recording and transcribing verbatim accounts of the trial proceedings as required by 28 U.S.C. § 753(b). Part of the record has been corrected under Fed.R.App.P. 10(e). However, it is not clear exactly *how* various portions of the record were corrected or reconstructed in any attempt to make it reflect a true account. Thus, it necessarily follows that without the basis being stated upon which each portion of the record was reconstructed, the extent to which various portions of the corrected record can be relied upon is not discernible—and it must be.

Our memorandum inquired as to the extent to which the reporter failed to make a verbatim account of the trial proceedings, and the means used to correct or reconstruct each portion of the record under Rule 10(e).

The District Court was unable to answer completely the inquiries of this court because Mr. Black could not be found, and Ms. Ruff declined to testify on account of a cardiac condition. The District Court filed a memorandum which relied on the judge's own recollection and the testimony of another court reporter, Mr. Thomas K. Dourian, expert in the reading of a reporter's notes. In this memorandum the District Court found that the charge to the jury was reported verbatim by Mr. Black, but that he lacked technical facility in the use of stenotype machine. There was no way to reconstruct how Ms. Ruff reconstructed the transcript. The Court stated that it had reviewed her transcript "which this Court corrected from its book of charges relating to Second Degree Murder, manslaughter and self-defense. The Court's recollection of the Charge as given and trial notes were also utilized."

The District Court included in the record a transcript of its charge as transcribed by Mr. Dourian from Mr. Black's notes. Mr. Dourian testified that these had not been accurately reflected in either the "unreconstructed" or the "reconstructed" charge filed by Ms. Ruff. Mr. Dourian's reconstruction was this: Mr. Black's notes of the charge were substantially verbatim, and although he occasionally left out a word, it

could be supplied by context. However, there were certain combinations of letters Mr. Black was unable to produce— e. g., KTS, the usual code for "act"— and so he hit other combinations of letters. But he used substitute combinations consistently, so that they could be interpreted if enough time and effort were devoted to the task. Normally, said Mr. Dourian, reading another reporter's notes is like reading the New York *Times*, but reading Mr. Black's notes "is like doing the New York Sunday *Times* crossword puzzle." But he concluded he was able to provide a reconstruction "to a reasonable stenographic certainty."

Appellant contends that he has been denied the transcript required by the Court Reporters Act. Congress has provided, 28 U.S.C. § 753, that the district courts shall appoint reporters, that their qualifications "shall be determined by standards formulated by the Judicial Conference," and that they "shall record verbatim by shorthand or by mechanical means . . . all proceedings in criminal cases had in open court." The finding that Mr. Black lacked technical facility in using the stenotype is, appellant puts it, "the functional equivalent of no record at all."

Appellant relies strongly on United States v. Workcuff, 137 U.S.App.D.C. 263, 422 F.2d 700 (1970). In that case an additional instruction was given the jury some time after it had retired to deliberate, at a time when the court re-porter was inexplicably absent. The court held this was a fatal defect requiring a new trial, notwithstanding acquiescence of the defense trial counsel in the instruction. The court declined to apply the harmless error rule, stating (137 U.S.App.D.C. at 264–265, 422 F.2d at 701–702):

> In light of the clear language of the statutory mandate, the ease with which its requirements can be satisfied, and the crucial importance of the transcript to meaningful appellate review, we think that such exceptions should be narrowly construed * * * There can be little doubt that the absence of a complete and accurate transcript impairs the ability of appellate counsel to protect his client's basic rights.

Although in the circumstances of the present case, we do not require a new trial, our disposition should in no way be taken as undercutting the authority of *Workcuff*. Congress has recognized both the right of appeal and the need for authentic transcripts as a necessary adjunct. These must be preserved.

The need for reliable reporters is obvious. Congress has provided that their qualifications shall be in accordance with standards prescribed by the Judicial Conference. Standards were adopted at the 1944 session [2] and amended in March 1971 for appointments made thereafter.[3]

Appellant's supplemental memorandum represents to us that this new standard

2. The Conference Resolution provides in part:

"1. That persons appointed as court reporters of the United States district courts shall be capable of reporting accurately verbatim by shorthand or mechanical means, proceedings before the court at a rate of 200 words a minute, and furnishing a correct typewritten transcription of their notes with such promptitude as may be requisite. They shall demonstrate familiarity with the terminology used in the courts, and shall be persons of unquestionable probity. . . ."

3. "1. An applicant for appointment hereafter as an official court reporter in the U.S.

District Courts shall possess as a minimum requirement:

(a) At least four years of prime court reporting experience in the free lance field of service or service in the lower courts or a combination thereof;

(b) A certificate of proficiency from the National Shorthand Reporters Association; or

(c) A certificate from the Administrative Office of the United States Courts stating that he has passed an examination conducted under the auspices of the Administrative Office."

* * * * *

"5. All initial appointments shall be on a probationary basis to be fixed by the employing court."

"has not been implemented due to lack of appropriations." This information was apparently obtained from Mr. William Barnes, Director of Personnel for the Administrative Office of the United States Courts. In the last analysis, these standards are only a means of assuring a correct transcript, and the trial court has the ultimate responsibility for assuring an accurate transcript.[4]

██ We are concerned with indications before us that the judge's standard charges may be used as a primary means of providing a transcript. The reporter's obligation is to provide a verbatim transcript. In regard to the charge there is plain need for an accurate transcript of what the jury is told. The need is particularly great where, as is the practice in this district, the judge maintains no written copy of his instructions for use in the jury room. We cannot countenance a reporter's tolerating gaps to be filled later by reference to the standard charge. Indeed, it may well be that it is precisely at points like standard charges that are familiar to the judge that errors creep in unnoticed. We do not say that the reporter cannot use a standard charge as an aid. It may help in taking notes initially—but only if the reporter has a copy in advance, and is vigilant to call the matter to the attention of the judge if there has been a (probably unintended) departure. It may possibly be of help in the transcription of notes already taken, though here the dangers of inaccuracy loom larger.

On balance, we are able to record our confidence that the second reconstructed charge, as transmitted to this court following the remand, is an accurate transcription of what the judge told the jury. The probability of accuracy is high, due to Mr. Dourian's heroic efforts. Mr. Black was not technically skilled, but a private code enabled him to overcome his deficiency to the point of providing an accurate transcript, and

enabled Mr. Dourian to provide an accurate transcript. Our confidence in the accuracy of Mr. Dourian's transcript is enhanced by the fact that it retained, in the part dealing with the malice instruction, material that was improper.

## III. THE MALICE INSTRUCTION

██ After defining malice generally, and explaining the distinction between express and implied malice, the judge charged:

> In determining whether a wrongful act is intentionally done, and is, therefore, done with malice aforethought, you should bear in mind it may be inferred that every person intends the natural and probable consequences of his own acts, but you are not required to so infer. (Dourian Tr. at 11)

Almost identical charges were the basis for reversal in Green v. United States, 132 U.S.App.D.C. 98, 405 F.2d 1368 (1968), where the court required a new trial and United States v. Wharton, 139 U.S.App.D.C. 293, 433 F.2d 451 (1970), where the court permitted entry of a judgment on a conviction for manslaughter. As the court said in *Green* (132 U.S.App.D.C. at 100, 405 F.2d at 1370):

> A wrongful act intentionally done is *not* therefore done with malice.

And in *Wharton* the court said "we find ourselves unable to say with fair assurance that the verdict was not swayed by the judge's instructional errors."[5] 139 U.S.App.D.C. at 303, 433 F.2d at 461.

As in *Green* and *Wharton*, there is an additional error in the malice charge, though it is different from the second error in those cases. At page 10 of the Dourian Transcript, malice is defined as

> a state of mind showing a heart regardless of social duty, a mind deliberately bent on mischief.

This instruction ignores United States v. Bush, 135 U.S.App.D.C. 67, 70, 416 F.2d

---

4. Even the strictest standards cannot guarantee against error of the reporter. That is the reason for F.R.App.P. 10(e).

5. The Government argues that the error was taken care of by the context of other parts

of the present charge. We do not need to consider what would have been the result if that were the only troublesome aspect of this case.

823, 826 (1969),[6] which required the following language: "Malice is a state of mind showing a heart regardless of the life and safety of others . . . ." *Id.* Although this court has held that a reference to "social duty" would not require reversal in cases tried prior to the decision in *Bush*,[7] its opinions make it clear that the "social duty" instruction should not be given at trials which take place after the *Bush* decision. Carter v. United States, supra note 7, 141 U.S. App.D.C. at 264, 437 F.2d at 697.

The trial in the instant case took place six months after the *Carter* opinion issued on December 8, 1970 and nearly two years after *Bush* was decided. The Government argues that this is harmless error when death is the result of shooting three bullets at close range. Characteristics of the offense must, of course, be taken into account, and the circumstances may generate an affirmance in some cases, e. g., United States v. Hinkle, 159 U.S.App.D.C. 334, 487 F. 2d 1205, 1207 (1973). But each case turns on its own situation. The present

case was far from clear cut, and we cannot be certain that the jury did not convict on the theory that when the police told the defendant to call them if deceased reappeared, this defined a "social duty" she disregarded by relying on her gun for self-defense.

In our view appellant is not entitled to a new trial,[8] but the circumstances lead us to follow the procedure that has evolved in our jurisprudence[9] and to remand. While the remand does not foreclose the possibility of a new trial,[10] we primarily contemplate entry of a judgment on a conviction for manslaughter.[11]

So ordered.

MacKINNON, Circuit Judge (concurring):

I concur in the conclusions as to the transcript and in the result which flows as to the other points from Judge Leventhal's opinion, but I do not believe that the alleged error in the malice charge is as egregious as Judge Leventhal's opinion asserts. The difference

---

**6.** *See also* Criminal Jury Instructions for the District of Columbia, Instruction 4.21 (2d Ed. 1972).

**7.** Carter v. United States, 141 U.S.App.D.C. 259, 437 F.2d 692 (1970), cert. denied, 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 655 (1971); United States v. Lumpkins, 141 U. S.App.D.C. 387, 439 F.2d 494 (1970).

**8.** We do not think prejudicial error was established, given the trial context and lack of objection, when the trial court (a) permitted the prosecutor to ask as to the character of the deceased, after defense counsel had initiated this line of inquiry, (b) refused to admit the arrest record of deceased, there being no crime of violence, (c) admitted testimony as to appellant's post-arrest statement, no question having been raised at trial that the statement should be paraphrased by the detective rather than read.

**9.** The lead case is Austin v. United States, 127 U.S.App.D.C. 180, 193–194, 382 F.2d 129, 142–143 (1967). The remand ordered there has now become a practice entrenched in our jurisprudence, see United States v. Thomas, 144 U.S.App.D.C. 44, 444 F.2d 919 (1971); United States v. Wharton, *supra*, 139 U.S.App.D.C. at 303 n. 65, 433 F.2d at 461 n. 65; United States v. Comer, 137 U. S.App.D.C. 214, 220–221, 421 F.2d 1149,

1155–1156 (1970); United States v. Bryant, 137 U.S.App.D.C. 124, 420 F.2d 1327 (1969); Allison v. United States, 133 U.S. App.D.C. 159, 409 F.2d 445 (1969); Hemphill v. United States, 131 U.S.App.D.C. 46, 402 F.2d 187 (1968).

**10.** As appears from several of the cases cited in note 9, our jurisprudence provides for a new trial if either the Government insists, or the trial judge concludes it is in the interest of justice. But we must caution that although we have not sustained appellant's claim of denial of speedy trial as to the trial already held, the question was not an easy one, in view of the delay of 20 months from arrest to trial. The difficulty would be exacerbated by a retrial, in view of the time required for appeal augmented by the delay required to correct the deficiencies in the transcript. Since the sentence originally imposed, one to twenty years, is similar to the sentence available following a manslaughter conviction, we have not deemed a retrial a sufficiently likely prospect to warrant our reaching the question whether appellant, if retried, would be denied her right to a speedy trial.

**11.** The trial court will have opportunity to take into account appellant's conduct on the release ordered in June, 1972, after the delay in transcript preparation became evident.

between the charge as given and the recommended charge is not substantial [1] and United States v. Bush, 135 U.S. App.D.C. 67, 70, 416 F.2d 823, 826 (1969), did not *require* it. It was not until Carter v. United States, 141 U.S. App.D.C. 259, 264, 437 F.2d 692, 697 (1970), decided some 16 months after *Bush*, that we stated such "definition should be used in instructions given after the *Bush* decision. . . ." [2] I would thus not remand the case, as we do, solely on the basis of this portion of the malice instruction. However, as to the portion dealing with intent it is my view that, in the absence of an *en banc* reversal, our prior decisions require that I concur with the disposition of the case as set forth in Judge Leventhal's opinion. Green v. United States, 132 U.S. App.D.C. 98, 405 F.2d 1368 (1968); United States v. Wharton, 139 U.S.App. D.C. 273, 433 F.2d 451 (1970).

---

1. 28 U.S.C. § 2111.

2. Such retroactivity would be impossible to accomplish. This trial, however, began on June 17, 1971.