Reginald PARKS, Appellant,

v.

UNITED STATES, Appellee.

Frederick GREENE, Appellant,

v.

UNITED STATES, Appellee.

Robert GRINNAGE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 80–466, 80–502 and 80–571.

District of Columbia Court of Appeals.

Argued March 10, 1982.

Decided Sept. 14, 1982.

**594**

Andrew L. Lipps, Washington, D.C., with whom William J. Mertens, Washington, D.C., was on the brief, both of the Public Defender Service, for appellant Greene.

Leroy Nesbitt, Washington, D.C., appointed by the court, for appellant Grinnage.

Sylvia Royce, Asst. U.S. Atty., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Wayne P. Williams, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Paul A. Lenzini, Washington, D.C., with whom Neal J. Tonken, Washington, D.C., was on the brief, both appointed by the court, for appellant Parks.

Before FERREN, PRYOR and BELSON, Associate Judges.

FERREN, Associate Judge:

A Superior Court grand jury indicted appellants Parks, Greene, and Grinnage on seven charges of murder and armed burglary, robbery, and assault arising out of the stabbings of two persons: the deceased, John Fulton, and the government's principal witness, Mary Bedney.[1] Before trial, appellants moved to dismiss the indictment for lack of a speedy trial and to suppress identification testimony by Mary Bedney, as well as by a corroborative witness, Larry Grant. The court conducted an evidentiary hearing, then denied the suppression motions. The court took the speedy trial motions under advisement and, after appellants' convictions on all charges, denied the motions at a post-trial hearing.

These appeals accordingly present questions of reversible trial court error in (1) denying appellants' motions to dismiss the indictment for lack of a speedy trial; (2) permitting Larry Grant to identify appellant Greene at trial after failing to identify him at the pretrial suppression hearing; and (3) denying appellant Parks' motion to suppress identification testimony by Mary Bedney. Appellants also challenge the trial court's actions in (4) excluding evidence that another person, James Mills, may have had a motive to commit the murder; (5) sustaining Greene's "attorney work product" objection to evidence offered by Parks; and (6) denying appellants' motions for a mistrial based on the prosecutor's closing argument.

Finding no reversible error, we affirm all convictions.

## I. The Suppression Hearing

### A. *Mary Bedney's Testimony*

At the suppression hearing, Mary Bedney testified that on the afternoon of June 27, 1978, she went to 12th and U Streets, where she saw appellant Greene and the deceased, John Fulton, in a blue car which Fulton often drove. Bedney also saw the three appellants together near 12th and U later in the day. At about 11 P.M., Bedney accompanied Fulton to his apartment. Bedney often bought drugs from Fulton, both for her own use and for resale on the street; she bought Dilaudid from him that evening.[2]

1. Specifically, each appellant was indicted for first-degree murder while armed, D.C.Code 1973, §§ 22-2401, -3202; two counts of felony murder, D.C.Code 1973, §§ 22-2401, -3202; first-degree burglary while armed, D.C.Code 1973, §§ 22-1801(a), -3202; two counts of armed robbery, D.C.Code 1973, §§ 22-2901, -3202; and assault with intent to kill while armed, D.C.Code 1973, §§ 22-501, -3202.

2. Mary Bedney testified that she was a long-time drug user but, at the time of the hearing, was on a methadone maintenance program. She said that for several years she had made her living selling drugs in the area of 12th and

Bedney was in the bathroom preparing to inject herself with Dilaudid when she heard a knock on the door. She untied her arm, went to the door, looked through the peephole, and recognized Greene. Calling to Fulton that "Ricky" Greene was at the door, she returned to the bathroom. As she was retying her arm, she looked up and saw Greene pointing a pistol at her. Through the open bathroom door, she saw "Reggie and Poo-Poo" (the names by which she knew Parks and Grinnage) in the bedroom, holding guns on Fulton. She heard them demand to know where money and drugs were hidden. Fulton told them, and appellants took money from underneath the mattress and drugs from the bathroom. They removed Bedney's clothing and bound her hands with tape. Bedney added, however, that she was not blindfolded.[3] She lay on the floor, and when she turned to look at Fulton she saw appellants standing over him. She was ordered to turn back around, and she did.[4] Bedney heard Fulton groaning, then heard Greene say "[M]an, she know me" and felt herself being stabbed in the neck.

Bedney did not lose consciousness. When she heard the apartment door slam, she stood up and wrapped herself as well as she could in the bedspread. As she made her

way toward the door, Bedney saw a blonde-haired, brown-skinned woman lying in the hallway of Fulton's apartment. Bedney stepped over her and left the apartment to seek help. (When the police arrived a few minutes later, no woman was lying in the hallway.)

Bedney knocked on the door of a nearby apartment, but the residents, frightened by the sight of the knife embedded in her throat, would not let her in. (They did, however, call the police.) Bedney walked out into the street. A cabdriver picked her up and took her to the hospital, where she underwent surgery to remove the knife from her throat.[5]

Soon after Bedney awoke on the morning of June 28, 1978, Metropolitan Police Detectives James Slawson and Francis McCloskey visited her in the hospital. They showed her a photo array, and she picked out a photo of Greene.[6] (The police had received independent information which led them to include Greene's photo in the array.) On July 6, the detectives showed Bedney another photo array in which she identified Grinnage. She selected a photo of Parks from still another array on July 11.

Bedney attended a lineup on October 31, 1978. She identified Greene and Grinnage

U Streets. She met appellants in the summer of 1977 and, since then, they often had "juggled" (sold drugs) for her. She knew that appellant Greene also had sold drugs for John Fulton.

3. At the suppression hearing, Detective Slawson stated on cross-examination that Bedney told him she had been blindfolded. At trial, Slawson acknowledged he had made notes indicating that Bedney had mentioned a blindfold, but he stated that he did not recall Bedney telling him she herself had been blindfolded.

4. Bedney testified at the hearing that when she turned to look at Fulton she saw Greene holding a gun on him while Parks bound his hands and Grinnage (who also was holding a gun) searched through bedroom drawers. At trial, Bedney testified that she twice turned to look at Fulton. The first time, she saw Greene and Grinnage—but not Parks—standing over Fulton, and Grinnage ordered her to turn back around. The second time she saw Greene and Grinnage standing over Fulton and saw blood

coming from him. Greene ordered her to turn back around.

5. Sergeant Lester Hardy, a special police officer at the Washington Hospital Center, testified at the suppression hearing that he had been present at the hospital emergency room when Bedney was admitted. He stated that before Bedney went into surgery, she communicated with doctors and police by writing on a pad. In response to questions from police, she wrote "Boo" or "Poo" (both nicknames for Grinnage). Bedney herself described this incident at trial. She said that she wrote her name and phone number and, when asked who stabbed her, she held up three fingers and wrote "Boo."

6. Dr. Barry Reid was qualified as a medical expert for the defense. He testified at the pretrial hearing that, in his opinion, Bedney had "an altered perception"—attributable to trauma and residual anaesthetic—when she viewed the first photo array on June 28, 1978.

but not Parks.[7] Immediately after the lineup, police took Bedney upstairs to the Homicide Office and showed her a photo array. She picked out Parks' photo. On a later occasion, police showed Bedney a photo of the October 31 lineup; she identified Parks, as well as Greene and Grinnage. She explained to police that she had been unsure about Parks at the lineup because he had trimmed his beard since she had last seen him.[8]

Finally, Bedney made in-court identifications of all three appellants at the suppression hearing.[9]

B. *Larry Grant's Testimony*

Larry Grant testified at the suppression hearing that he lived in John Fulton's apartment building. On June 27, 1978, he had been standing outside the building at about 11 P.M., waiting for his cousin to return his car. He saw three men come out of the alley across the street. They passed within an arm's length of Grant and entered the apartment building. Grant said that the first man was brown-skinned, had an oval hairline and a goatee, and was wearing dark clothing. The second was "fair-complected" with "a very odd color of eyes." He was wearing a red-striped sweater-shirt and was "fumbling with something around his waist" as he passed Grant. The third man was "dark-complected," "tall," and "muscular-built," with close-cut hair worn in a part. The men gave Grant "an eerie feeling," so he returned to his apartment and locked himself in. About fifteen minutes later he heard running footsteps on the stairs, but he stayed in his apartment until the police arrived. Grant testified that he did not then describe the three men to the police; he had been afraid to do so.

Grant stated that Douglas Wood, a Public Defender Service investigator, interviewed him in November 1978. Wood showed Grant a photo of the October 31, 1978 lineup and asked whether he could identify any of the men he had seen entering his apartment building on June 27. Grant testified that he had picked the men wearing Shields No. 3 (Grinnage), No. 5 (Greene), and No. 1 (Parks), but that "it was a toss-up" between No. 1 and No. 15. He added that Wood "snatched" the photo away before he could look carefully at Nos. 1 and 15.

Grant further testified that Wood returned within a week and again showed him the lineup photo. This time, Grant said, he selected Nos. 3, 5, and 15. Grant explained that, again, he felt he was given insufficient time to view the photo. On cross-examination, Grant admitted that he actually had picked No. 15 the first time he saw the photo and had not told Wood that No. 1 was "a maybe."

Grant also testified that Detective Slawson showed him the same lineup photo in November 1979, and that he had picked Nos. 3, 5, and 1. Grant said that the prosecutor showed him the lineup photo again in January 1980 and that, as before, he picked Nos. 3, 5, and 1.[10]

Grant made in-court identifications of Parks and Grinnage but identified a courtroom spectator, not Greene, as the third man he had seen the night of the murder.

7. She testified that she had been unsure about the person wearing Shield No. 1 (Parks).

8. Detective Slawson testified that Parks' appearance had changed during the time between his arrest and the lineup. Slawson said, "[T]here seemed to be a difference in facial hair and complexion and possibly weight."

9. Detectives Slawson and McCloskey confirmed Bedney's photo array, lineup, and lineup photo identifications of appellants.

10. Detective Slawson, whose recollection was somewhat different, testified at the suppression hearing that he interviewed Grant on November 5, 1979 and showed him the lineup photo Grant identified Nos. 3, 5, and 15 (not No. 1, as Grant had testified). Grant told Slawson that he had seen the lineup photo about a year before, in two interviews with Douglas Wood; that he had identified only two persons in the photo during the first Wood interview; and that he had identified three during the second interview. Slawson confirmed that Grant identified Nos. 3, 5, and 1 when he viewed the lineup photo on January 21, 1980, in the prosecutor's office.

C. *Appellants' Motions*

At the close of the hearing, appellants asked for suppression of all identifications by Bedney, alleging that the procedures used to obtain them were unduly suggestive. Appellants also contended that Grant's pretrial identifications should be suppressed, claiming they were inherently unreliable. In addition, Parks attacked on sixth amendment (right to counsel) grounds his identification by Bedney in the October 31, post-lineup photo array; and Greene moved to prohibit Grant from making an in-court identification at trial because Grant had failed to identify him at the hearing. The court denied all motions to suppress.

II. THE TRIAL

A. *The Government's Case*

The next day, at trial, Bedney, Grant, and Slawson repeated substantially the same testimony each had given at the pretrial hearing. (*See* notes 1, 3, 4, 8, 9, 10 *supra.*)[11] Slawson also testified that after he and McCloskey had arrested Greene, read him his *Miranda*[12] rights, and told him he was charged with the murder of John Fulton, they asked Greene whether he knew Fulton. Greene replied that he had been selling drugs for Fulton near 12th and U streets during the evening of June 27, 1978, when people told him that Fulton wanted to see him at Fulton's apartment. Greene said he "went up there." He made no further statements.[13]

The government presented a number of other witnesses: Gladys Martin saw, but could not identify, three men—one of whom was wearing a red and white sweatershirt—coming out of Fulton's apartment building counting something and carrying what looked like a box (Fulton's portable television was missing from the apartment). Two witnesses had seen Greene earlier in the day and generally corroborated that he had been wearing a shirt similar to the one described by Grant and Martin. A medical expert described Bedney's wound and stated that she had been "alert," "awake," and "oriented" just before Slawson and McCloskey showed her the first photo array on June 28, 1978. *But see* note 6 *supra.*[14]

11. Bedney repeated her account of the stabbings and made in-court identifications of all three appellants. She also described her previous identifications. She was questioned closely about her drug use, her 1977 conviction for bail jumping, her use of false names, and several inconsistencies between her trial testimony and her previous testimony before the grand jury.

Grant repeated his descriptions of the men he had seen on June 27, 1978, and made in-court identifications of all three appellants. Grant also repeated the testimony he had given at the pretrial hearing about his prior identifications of appellants. As at the hearing, Grant stated on direct examination that he had not been able to decide between Nos. 1 and 15 when Wood showed him the lineup photo but admitted on cross-examination that he had picked No. 15 on both occasions, while thinking No. 1 was "a maybe." Grant stated that he had picked Nos. 3, 5, and 1 when Slawson had shown him the lineup photo in November 1979, but Slawson testified that Grant in fact had picked Nos. 3, 5, and 15. Grant was questioned at length about his failure to identify Greene in court at the hearing the day before; he responded that he had recognized Greene at the hearing but had been afraid to say so.

Slawson repeated his testimony that Bedney had identified appellants from photo arrays, the lineup, and the lineup photo. He added that Grant had picked Greene and Grinnage out of the lineup photo in November 1979 and had identified all three appellants from the lineup photo in January 1980.

12. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. Slawson also described the unsuccessful steps he had taken to locate the woman whom Bedney said she had seen lying in Fulton's hallway. Officer Stephen Gately, who arrived at Fulton's apartment approximately a minute after receiving a radio report that Bedney was wandering in the street, testified that he had not seen a woman lying in the hallway.

14. Another medical expert testified that he had witnessed the autopsy performed on Fulton and that Fulton had suffered twenty-four stab wounds which had caused his death. A fingerprint expert testified that none of appellants' fingerprints matched those recovered from Fulton's apartment. The police officer who first responded to Fulton's apartment testified that he observed a broken lock hanging off the front door.

B. *The Defense Cases*

1. *Greene*

None of the appellants took the stand. Greene called Grinnage's aunt, Rosetta Ross, as a defense witness. Ross testified that she and her daughter, Rositta, attended a 1978 Christmas party at the office of Dr. William Dixon, and that Mary Bedney was at the party. Rosetta Ross stated that she had heard Bedney say to Rositta, "Let's not argue about this; your family get $3000 together and I will free him." [15]

The prosecutor attempted to impeach Rosetta Ross with a certified copy of a robbery conviction of "Rosetta Ross." Greene's counsel intervened, advising the court that Rosetta's daughter, Rositta, had been convicted of robbery but that he had no information showing that Rosetta, the mother, had a conviction. The prosecutor replied that he had a good faith basis for asking the question; he possessed a certified copy of a conviction in the witness' name. The court allowed him to ask, "[Are you] the same Rosetta Ross who was convicted of robbery?" The witness answered, "No. My daughter, not me."

Greene also called Edward O'Connor, Jr., a former Metropolitan Police officer, who testified that he had investigated the shooting of Fulton's wife, Mattie Brown, in May 1978. When O'Connor arrived on the scene, he found Brown dead, and her brother and her sixteen-year-old son, Marvin Young, in the room with the body. The brother told O'Connor that John Fulton had shot Brown. The son was distraught and, at one point, picked up a gun from the dining room table, waved it threateningly, and walked toward the doorway. O'Connor took the gun away from the boy. John Fulton later was arrested for his wife's murder.[16]

Finally, Greene called Detective Dwight Veasey, who testified that he had prepared in the normal course of duty a police report ("PD–123") which had recorded certain relevant information called into the station. The report revealed that at 4:05 A.M. on June 28, 1978, Officer Steven Smith had stopped William Duncan, who lived in the apartment building across the street from Fulton's, in the vicinity of the murder. Duncan was black, eighteen years old, 5′7″ to 5′8″ tall, and wearing a red short-sleeved shirt with white stripes and blue cut-off shorts.[17]

2. *Grinnage*

Grinnage called three alibi witnesses. His sister, Francine Grinnage, testified that she and her friends, Alberta Johnson and Pat Jackson were all with Grinnage at her home from 9:00 P.M. on June 27, 1978, until after 1:00 A.M. on June 28. Francine Grinnage said that appellant slept at her house and that she had awakened him at 7:00 A.M. on June 28 before she left for work.[18] Alberta Johnson testified that she had been at Francine Grinnage's house on the eve-

15. Bedney denied that she had attended the party or made this statement. Dr. Dixon also testified that Bedney had not been at the party.

16. In rebuttal, Detective McCloskey testified that the gun Young picked up in the presence of Officer O'Connor was missing a cylinder pin and therefore could not be fired. McCloskey added that he went to the Young home immediately after investigating the Fulton murder scene. When he arrived at about 2 A.M. on June 28, 1978, he found the family (including Brown's brother and Marvin Young) at home asleep.

17. Detective McCloskey testified that the police had received a tip (on or before June 29) from a woman named "Lil," who lived with Duncan, to "check" him because he had been seen coming out of a building in the block sometime after the stabbings. McCloskey further testified that photo arrays seen by Bedney on June 29 and July 5, 1978—when she identified no one—contained photos of Duncan. Fingerprint expert Thomas Burse testified that Duncan's fingerprints did not match any found in Fulton's apartment.

18. The payroll supervisor at Howard University Hospital, where Francine Grinnage worked, testified during government rebuttal that Ms. Grinnage had been on annual leave, and thus had not reported to work, from June 26 through June 30, 1978. Also, a National Weather Service meteorologist testified that there was a heavy rainstorm from about 7:30 P.M. to about 9:00 P.M. on the evening of June 27, 1978 (contrary to Francine Grinnage's testimony that it had not rained that night).

ning of June 27 and that appellant Grinnage was there when she went to sleep at 10:00 P.M. and was sleeping on the living room couch when she awoke at 5:30–5:40 A.M.

Pat Jackson testified that she had been with appellant Grinnage from 5:00 or 6:00 P.M. on June 27 until about 1:00 A.M. the next morning, first at her home and then at his sister's home. On cross-examination, Jackson admitted that Francine Grinnage had "helped" her remember the events of June 27. According to Jackson, "[Francine Grinnage] said I was there the 27th, and that was the only time I was at her house." Jackson herself could not remember whether she had been with appellant the evening of June 27 or of June 28.

3. *Parks*

Parks presented no evidence. His counsel proffered investigator Douglas Wood as a witness, claiming Wood's testimony would show—and his notes would confirm—that Grant picked No. 15 both times Wood showed him the lineup photo and did not mention No. 1 (Parks), even tentatively. Parks' counsel also proffered that Wood would deny he "snatched" the photo away from Grant. Greene objected to Wood's evidence, however, on attorney work-product grounds. The court declined to examine Wood's notes *in camera* and sustained the objection, excluding Wood's testimony and notes. Parks then moved to sever his trial from the others, but the court denied the motion.[19]

C. *The Convictions*

After government rebuttal, closing arguments, and instructions to the jury, all three appellants moved for a mistrial, asserting that the prosecutor's closing argument was improper. The court took the motions under advisement and submitted the cases to the jury, which convicted appellants on all charges. Parks then filed a motion for a new trial based on the court's exclusion of Wood's testimony and denial of his related motion for severance.

At a post-trial hearing, the court denied (1) Parks' motion for a new trial, (2) appellants' motions to dismiss the indictments for lack of a speedy trial, and (3) appellants' motions for a mistrial. The court sentenced appellants to twenty years' to life imprisonment for murder and ten years' to life for assault with intent to kill, to be served consecutively, and to equal or shorter concurrent sentences on the other charges. Appellants timely noted their appeals.

III. Speedy Trial

In considering appellants' pretrial motion to dismiss for want of a speedy trial, the trial court had to evaluate four factors: the length of the delay between arrest and trial, the reasons for the delay, the defendant's assertion of the right, and prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

A. *Length of Delay*

Approximately nineteen months passed between the arrests and trial.[20] When the period between arrest and trial is a year or more, the accused has established a *prima facie* sixth amendment violation, and the burden shifts to the government to prove that no violation has occurred. *Warren v. United States,* D.C.App., 436 A.2d 821, 833 n. 28 (1981); *Asbell v. United States,* D.C.App., 436 A.2d 804, 812 (1981); *United States v. Bolden,* D.C.App., 381 A.2d 624, 627 (1977); *Branch v. United States,* D.C.App., 372 A.2d 998, 1000 (1977). The longer the delay, the heavier the govern-

19. The prosecution had called Douglas Wood as a witness at the pretrial hearing. At that time, Wood testified that he had interviewed Larry Grant in the course of his duties as a Public Defender Service investigator. When Wood was questioned about the interviews, however, counsel for Greene objected, arguing that any response by Wood should be excluded under the work product doctrine. The court sustained the objection, and Wood did not testify further.

20. Greene, Grinnage, and Parks were arrested, respectively, on June 28, July 8, and July 12, 1978. They were indicted on January 11, 1979, and trial began on January 29, 1980.

ment's burden, but "the delay that can be tolerated for a serious and complex charge ... is considerably more than for a simple misdemeanor." *Warren, supra* at 834 (*quoting Rink v. United States,* D.C.App., 388 A.2d 52, 58 n. 11 (1978)); *see Strickland v. United States,* D.C.App., 389 A.2d 1325, 1329 (1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979). This case involved serious charges and complex issues; thus, the government's burden is less than it would have been in a simpler case. *Compare Warren, supra* at 834 (twenty-two-and-one-half-month delay between arrest and second trial was justified in case involving "serious multiple charges" against multiple defendants) *with United States v. West,* 164 U.S.App.D.C. 184, 188, 504 F.2d 253, 257 (1974) (thirteen-month delay constitutes denial of speedy trial where the charged offense is "non-violent" and "the issues of fact and law are not complex").

B. *Reasons for Delay*

■ As the trial court found, the delay here was "institutional," caused primarily by court congestion. The delay is therefore chargeable to the government but does not weigh as heavily as deliberate delay. *Barker, supra,* 407 U.S. at 531, 92 S.Ct. at 2192; *Freeman v. United States,* D.C.App., 391 A.2d 239, 241 (1978); *see Branch, supra* at 1000.

C. *Assertion of the Right*

Within eleven months of his arrest, *see* note 20 *supra,* Parks moved on June 1, 1979 for review of conditions of release and, alternatively, for an advance of the trial date.[21] On October 11, he moved to dismiss the indictment for lack of a speedy trial. Similarly, Greene moved for review of conditions of release on July 25, 1979 and formally filed a speedy trial motion on September 21. Grinnage moved for a speedy trial on September 12, 1979.[22]

Although these assertions were made between eleven and fourteen months after appellants' arrests, *see* note 20 *supra,* they did not come on the eve of trial, which began four to seven months after the speedy trial demands. *Compare Bethea v. United States,* D.C.App., 395 A.2d 787, 793 (1978) (speedy trial violation found where "over six months passed between appellant's assertion of her right and the trial") *with Campbell v. United States,* D.C.App., 391 A.2d 283, 286 (1978) (no speedy trial violation found where defendant asserted right after sixteen months and trial followed within one month). Moreover, when a defendant is incarcerated pending trial, as were appellants, "the government must assume that he wants a speedy trial unless he asserts otherwise." *Strickland, supra* at 1331; *Branch, supra* at 202; *see United States v. Calloway,* 164 U.S.App.D.C. 204, 210, 505 F.2d 311, 317 (1974).[23]

D. *Prejudice to Appellants*

■ Prejudice (or lack of it) is an especially significant factor. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *Bethea, supra* at 793; *see United States v. (John) Jones,* 173 U.S.App.D.C. 280, 298, 524 F.2d 834, 852 (1975). The speedy trial right is intended to protect against three types of prejudice: oppressive pretrial incarceration, anxiety,

21. "[A] motion for release is to be construed as the functional equivalent of a motion for speedy trial." *Branch v. United States,* D.C. App., 372 A.2d 998, 1002 (1977) (*citing United States v. Calloway,* 164 U.S.App.D.C. 204, 210, 505 F.2d 311, 316 (1974)).

22. Grinnage and Parks also had moved for review of conditions of release on July 17, 1978, and October 2, 1978, respectively, but these preindictment motions cannot be considered speedy trial demands.

23. In *Jefferson v. United States,* D.C.App., 382 A.2d 1030, 1032 (1978), this court stated that incarceration "does not put the government on notice of an implied demand for a speedy trial where incarceration was the result of parole revocation and would not have been affected by a speedy acquittal." But in *Strickland v. United States,* D.C.App., 389 A.2d 1325, 1331 & n. 10 (1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979), the court later held that "the constructive demand arising from the fact of [the defendant's] incarceration certainly preserved his [speedy trial] right," even though the defendant was incarcerated on another charge.

and impairment of the defense. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *Bethea, supra* at 792–93. *See also United States v. MacDonald,* — U.S. —, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1982).

A defendant need not affirmatively show prejudice in order to prevail on a speedy trial claim, *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973) (per curiam); and when—as here—the defendant's claim has *prima facie* merit, the government must make a showing which "convincingly outweighs" a defendant's assertion of prejudice. *Day v. United States,* D.C.App., 390 A.2d 957, 970 (1978) (*quoting United States v. Rucker,* 150 U.S.App.D.C. 314, 316, 464 F.2d 823, 825 (1972)). The government is not, however, required to produce independent evidence rebutting the presumption of prejudice; it may carry its burden by arguing both the objective facts of record and inferences to be drawn from those facts. *Day, supra* at 971; *see Jefferson v. United States,* D.C.App., 382 A.2d 1030, 1032 (1978); *Bolden, supra* at 628–29.

1. *Oppressive Pretrial Incarceration*

All three appellants were incarcerated pending trial. Greene was held on a parole violation warrant and on three pending misdemeanor charges, as well as on the charges in this case. Grinnage and Parks also were held on parole violation warrants, as well as on the charges in this case. (Parks' parole, however, expired on September 29, 1978; thereafter, according to the trial court, he was held for fifteen months on the charges in this case alone.)

This court stated in *Bridgeford v. United States,* D.C.App., 411 A.2d 633, 635 n. 3 (1980) that because a defendant's imprisonment while awaiting trial "was equally due to the pendency of a criminal charge in another case," the delay "did not result in excessive pretrial incarceration." *See Day, supra* at 971 (noting that, although the possibility of prejudice was not eliminated, it was significant that defendant "was imprisoned for other crimes during most of the period between arrest and trial"); *Jefferson, supra* at 1032 ("To the extent that prejudice may be presumed from the fact of incarceration, the parole revocation breaks the nexus between the delay and the prejudice.")

We conclude that, in light of the fact that Greene and Grinnage were not incarcerated solely on the charges in this case, the delay between arrest and trial did not cause oppressive pretrial incarceration. Parks' case is different. He was incarcerated for fifteen months on the present charges alone and thus suffered prejudice to the extent that this period exceeded the time reasonably necessary to bring Parks to trial.

2. *Anxiety*

Greene and Parks allege that they suffered anxiety from the delay in bringing them to trial. (Grinnage does not join in this claim.) Where, as here, the charge carries a life sentence and the defendant is incarcerated, a claim of anxiety is plausible. *Compare United States v. Bolden, supra* at 629 (anxiety was "minimal" where charge was misdemeanor, more serious charges were outstanding for part of period, and defendant was not imprisoned). Although an assertion of the right to a speedy trial is relevant to the question whether a defendant is anxious about delay, *see Bethea, supra* at 793, "a mere assertion that one had been upset or concerned about a pending criminal prosecution is not sufficient" to establish prejudicial anxiety. *Reed v. United States,* D.C.App., 383 A.2d 316, 320, *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). Therefore, even when the government has the burden to rebut a defendant's assertion of anxiety, *see Bethea, supra* at 793, the government will prevail unless the defendant proffers objective, contemporaneous evidence of anxiety, such as prompt and persistent assertion of the desire for a speedy trial coupled with a demonstrable basis for the court's believing the delay is traumatic. *See id.* (defendant having no prior experience with criminal justice system persistently sought speedy trial on petty theft charge); *see generally United States v. Ellis,* D.C.App., 408 A.2d 971, 975 (1979) (Ferren, J., dissenting).

Greene and Parks twice asserted their speedy trial rights—and with reasonable promptness. *See* Part III.C. *supra.* But Parks proffered no other demonstration of anxiety. As veteran defendants in the criminal justice system, neither Parks nor Greene claimed—or could have claimed—anxiety based on the unknown. *Compare Bethea, supra* at 793. Greene, however, did attach to his speedy trial motion some contemporaneous evidence of anxiety: letters he had written to his trial attorneys urging them to move swiftly because his wife was pregnant and they both were anxious about the impending birth. (Tragically, the baby died soon after birth in December 1978, six months after Greene's arrest.)

We therefore agree with the trial court's finding that Parks offered no more than a "mere assertion" of anxiety, *Reed, supra* at 320, and we conclude, accordingly, that the government has rebutted that claim. The trial court also found that Greene offered only a "mere assertion," within the meaning of *Reed.* To the contrary, Greene's letters to his attorney reflecting concern about a speedy trial were objective, contemporaneous evidence of anxiety. But Greene's letters (of record) ended after January 1979, and thus their relevance substantially abated beyond the first seven months after arrest, a period during which no one reasonably could have expected this complex case to come to trial—and thus not a period of "delay." *See Day, supra* at 966. We therefore must conclude that Greene's anxiety claim also fails.

3. *Impairment of Defense*

The interest in presenting an unimpaired defense is the "most serious" interest protected by the speedy trial right. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *Warren, supra* at 836. In asserting this issue, an appellate court must give deference to the trial court's post-verdict findings of fact. *Reid v. United States,* D.C. App., 402 A.2d 835, 837 (1979); *Bethea, supra* at 793; *see United States v. MacDonald,* 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978).

Greene asserts that the delay weakened his defense because, at trial, former Metropolitan Police Officer Steven Smith no longer could remember anything about the occasion on which he stopped William Duncan in the vicinity of the murder.[24] The trial court found, however—and the record supports the finding—that Smith's lapse of memory did not significantly prejudice Greene's defense. The evidence before the jury included a police form containing all the information that Smith called in to the station concerning his stop of Duncan. *Cf. United States v. Sarvis,* 173 U.S.App.D.C. 228, 233, 523 F.2d 1177, 1182 (1975) (no substantial impairment of defense where witness was unavailable at second trial but portions of her first-trial testimony were read to the jury). In any event, Greene's theory that Duncan was the murderer was severely undercut by the fact that Mary Bedney viewed two photo arrays which contained Duncan's picture but did not identify him. *See* note 17 *supra.*

Grinnage alleges that the delay undermined his defense because of the faded memories of his alibi witnesses. The record supports the trial court's finding to the contrary. As the trial court stated, the "difficulties" in the alibi testimony appeared attributable "more to fabrication than to impairment of memory." *See* note 18 & accompanying text. *See also Forbes v. United States,* D.C.App., 390 A.2d 453, 456 (1978); *Day, supra* at 972; *Bowman v. United States,* D.C.App., 385 A.2d 28, 32 (1978).

Parks presented no evidence. He asserts an impairment of his defense based on the general proposition that the memories of prosecution witnesses faded. Since any loss of memory by these witnesses presumably harmed the prosecution as much as the defense, however, there is no basis for inferring that Parks was prejudiced. *See Bark-*

24. Smith was not a witness at trial; he testified during a midtrial hearing on the speedy trial motions that he had left the police force in 1979, had discarded all of his notes at that time, and remembered nothing about the Duncan stop.

*er, supra,* 407 U.S. at 521, 92 S.Ct. at 2187; *Warren, supra* at 836.

In sum, the record supports the trial court's conclusion that the government had a strong case and that it was "almost inconceivable that a more expeditious trial would have permitted these defendants to present a more effective defense or to punch any additional significant holes in the prosecutor's case." *See Strickland, supra* at 1332 (*citing United States v. Canty,* 152 U.S.App. D.C. 103, 114, 469 F.2d 114, 125 (1972)).

### E. *Conclusion*

After reviewing the trial court's findings in light of the four *Barker* factors, we conclude that—despite a nineteen-month period between arrest and trial casting the burden of persuasion on the government—appellants' speedy trial rights were not infringed. Although appellants did assert their rights, they waited eleven to fourteen months to do so and were tried within four to seven months thereafter. Furthermore, although the delay was chargeable to the government, it was relatively neutral, "institutional" delay that "may easily be outweighed by a low threshold of prejudice." *Hilton v. United States,* D.C.App., 435 A.2d 383, 391 (1981); *see United States v. Perkins,* D.C.App., 374 A.2d 882, 883–84 (1977). These cases accordingly turn on whether the government convincingly rebutted appellants' claim of prejudice.

There was no evidence of prejudice to Grinnage. Although Greene demonstrated a small measure of prejudicial anxiety and Parks' incarceration (attributable to the charges here) was inordinately long, there is no evidence that defense preparation of any appellant was impaired—the "most serious" prejudice at issue here. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193; *Warren, supra* at 836. We do not believe that minimal anxiety or several months of incarceration above the norm, without a corresponding impairment of defense preparation, is enough prejudice to warrant reversal, given the seriousness and complexity of this joint trial and the corresponding need for thorough preparation by all concerned.

## IV. Grant's In-Court Identification of Greene

Greene argues that the trial court committed reversible error in permitting Larry Grant to identify him at trial. Because Grant failed to identify Greene at the suppression hearing the day before, Greene asserts that the identification at trial had little probative value, compared with its potential for confusing the jury.

This court has held, however, that "the failure to make an earlier identification goes to the weight to be accorded to the witness' in-court testimony, and not to its admissibility." *Middleton v. United States,* D.C.App., 401 A.2d 109, 133 (1979) (citations omitted). Because of counsel's thorough cross-examination, the jurors knew about Grant's failure the day before. It was the jurors' proper role, therefore, to determine the weight that Grant's in-court identification deserved. *See id.* (not error to admit in-court identification by witness who had failed to identify defendant from photo arrays); *cf. Reavis v. United States,* D.C.App., 395 A.2d 75, 77–79 (1978) (not plain error to admit in-court identification by witness who had failed to identify defendant from photo arrays and line-up); *In re W.K.,* D.C.App., 323 A.2d 442, 444 (1974) (not error to admit in-court identifications by witnesses who had not attempted or "made any pretrial identification, either by photograph or otherwise").

## V. Bedney's Identification of Parks in the October 31, 1978 Photo Array

Parks asserts that the trial court erred in refusing to suppress his identification by Mary Bedney in the October 31, 1978 photo array (as well as Bedney's subsequent identifications). He cites, first, a violation of his sixth amendment right to counsel because his attorney was not present when Bedney viewed the array. Parks also asserts a due process violation, claiming the array was unnecessarily suggestive and conducive to irreparable mistaken identification.

A. *Right to Counsel*

Although the right to counsel applies under some circumstances to in-person, pretrial confrontations such as lineups and show-ups, *United States v. Wade,* 388 U.S. 218, 236–37, 87 S.Ct. 1926, 1937–1938, 18 L.Ed.2d 1149 (1967), it does not apply to photographic identifications. *United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973); *Thomas v. United States,* D.C.App., 382 A.2d 24, 27 (1978); *Williams v. United States,* D.C. App., 379 A.2d 698, 699 (1977). The right to counsel, moreover, applies even to lineups and show-ups only after formal prosecution has begun, *e.g.,* after indictment. *Moore v. Illinois,* 434 U.S. 220, 226–27, 98 S.Ct. 458, 463–464, 54 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 688–90, 92 S.Ct. 1877, 1881–1882, 32 L.Ed.2d 411 (1972) (plurality opinion); *Washington v. United States,* D.C.App., 334 A.2d 185, 186 (1975).[25] Thus, Parks' right to counsel has not been infringed; the challenged identification resulted from a photo display, not a confrontation, and took place on October 31, 1978, before the January 11, 1979 indictment.

B. *Due Process*

Parks alleges that even if the October 31, 1978 photo presentation did not violate his right to counsel, it was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *see Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970–971, 19 L.Ed.2d 1247 (1968). Such suggestiveness, he says, is attributable to four factors: Bedney knew at the time of the photo identification that Parks had been arrested for the crime; the array was the very one from which Bedney had identified Parks on July 11, 1978, with the result that Parks' photo "was emphasized by repetition"; Bedney's failure to make the lineup identification increased the pressure on her to make a photo identification a few minutes later; and, in any event, the array was suggestive because Parks' photo, in contrast with the others, was faded. We are not persuaded.

In the first place, Bedney's knowledge that Parks had been arrested for the crime did not create impermissible suggestiveness, for she was not told that any of the persons depicted in the photo array had been arrested. Moreover, the fact that Bedney had chosen Parks' photo from the same array once before did not make the second viewing improperly suggestive, especially since the first identification had occurred three and one-half months earlier.

Furthermore, Bedney's failure to make a lineup identification a few moments earlier did not create such pressure that we must conclude the photo array was unduly suggestive. Bedney, of course, knew that the purpose of the array was to allow her "to pick out the third person," but she would have known this no matter what identification procedure was used, and, given Parks' different physical appearances in the lineup and the earlier photo array, *see* note 8 *supra,* nothing about the lineup made the October 31 showing of that photo array unduly suggestive.

The fourth factor—the faded photo issue—is more difficult. By the time of the January 1980 suppression hearing, appellants' photos in the arrays shown to Bedney on June 28 (Greene), July 6 (Grinnage), and July 11 (Parks), 1978, and again on October 31, 1978 (Parks), were faded, in contrast with the others. Detective Slawson testified that the fading was attributable to different paper from that used for the other photos in the arrays, and that appellants' photos had not yet faded when Bedney viewed them in June and July, 1978. In

25. *But cf. Blue v. State,* 558 P.2d 636, 640–42 (Alaska 1977) (Alaska constitution guarantees right to counsel at preindictment lineup, absent exigent circumstances); *People v. Bustamante,* 30 Cal.3d 88, 100, 634 P.2d 927, 934, 935, 177 Cal.Rptr. 576, 584–85 (1981) (California constitution guarantees right to counsel at preindictment lineup); *People v. Jackson,* 391 Mich. 323, 337, 217 N.W.2d 22, 27 (1974) (held, based on court's supervisory power, that defendant is entitled to counsel at preindictment, in-person *or* photographic identification).

finding that the June and July arrays were not suggestive, the trial court specifically credited Slawson's testimony.

Slawson also testified, however, that he had noticed appellants' photographs even had faded by the time "we were ready for trial the last time," in December 1979. He therefore had made fresh prints of appellants' photos in anticipation of trial, using the same process applied to the original prints. The relatively new, December 1979 prints were shown to Slawson at the suppression hearing, and he commented that they, too, had begun to fade but had been as dark as the other photos in the arrays when he had made them. It seems clear that, since the new prints had faded noticeably between December 1979 and the January 1980 suppression hearing, the identically produced, original print of Parks must have faded during the three and one-half month period between July 11, 1978 (when the print was first placed in an array) and October 31, 1978, when Bedney viewed the array for the second time.[26]

Still, even assuming that the October 31, 1978 array was suggestive because Parks' photo had faded,[27] the array was not conducive to irreparable misidentification, since any suggestiveness occurred after a constitutionally acceptable identification. *See United States v. Brannon,* D.C.App., 404 A.2d 926, 928 (1979); *Patterson v. United States,* D.C.App., 384 A.2d 663, 667 (1978).

More specifically, the trial court found—and the record reflects—that Bedney had made a constitutionally acceptable identification of Parks from the July 11, 1978 array. There was credible testimony that Parks' photo had not yet faded in July 1978. Nor was the manner of the display suggestive: Bedney went through the entire photo array, set aside Parks' photo, returned to it when she had finished, and said something to the effect that "[t]his looks like the third subject who is the subject that hung [out] at 12th and U, this is the third subject." Furthermore, Bedney identified Parks by name, as "Reggie," before she made a photographic or in-person identification. It follows that the trial court did not violate due process in refusing to suppress the testimony confirming Bedney's October 31, 1978 identification (and her later identifications) of Parks. *See Brannon, supra* at 930; *Patterson, supra* at 668. Once "the due process concern is eliminated," the issue of suggestiveness "should become a matter for exploration at trial and argument to the jury." *Id.,* at 667 n. 6 (citations omitted). Here, the issue was explored and argued most thoroughly. *See Turner v. United States,* D.C.App., 443 A.2d 542, 552 (1982).

## VI. Exclusion of Evidence Proffered by Greene

At the close of his case, Greene told the court that he intended to call Officer Rufus Archer, proffering that this testimony would show that Archer had seen James Mills rob John Fulton on June 3, 1978, and that a prosecution for that robbery was pending against Mills at the time of the stabbings. Greene also proffered that Mills himself would testify that Fulton had owed him $300, and that when Fulton would not pay, Mills robbed him. Greene's counsel argued that this testimony was relevant to show that Mills had a motive to kill Fulton, in order to keep Fulton from testifying against him in the armed robbery prosecution.

The trial court excluded the proffered evidence on the ground that it

26. At trial, Mary Bedney was cross-examined about the faded photo of Parks, but her responses were ambiguous:

Q: It's very [much] lighter than all the rest of the photographs in that group; is that right?
A: Yes.
Q: And is that how it looked on [October 31, 1978]?
A: No.
Q: It didn't look like that on that day?
A: No.
Q: How did it look on that day?
A: He had more hair on his face than at the lineup.

27. *But see Harley v. United States,* D.C.App., 373 A.2d 898, 900 (1977) (array was not suggestive where defendant's photo was the only one that was not a numbered mug shot, and the only one in which the subject was wearing a coat resembling that worn by the assailant).

lacked sufficient probative value. The court stated, "[I]t's too big a leap to move from a robbery arrest to a motive for killing.... [W]hat we would be asking the jury to do is speculate that a person whom the deceased had caused to be arrested would, in fact, return to kill him." We will disturb a trial court's determination regarding relevance only if the court has abused its discretion. *Towles v. United States,* D.C.App., 428 A.2d 836, 846 (1981); *Randall v. United States,* D.C.App., 353 A.2d 12, 14 (1976). We perceive no abuse here.

## VII. The Court's Sustaining of Greene's Work-Product Objection to Parks' Evidentiary Proffer

Parks argues that the trial court committed reversible error when it refused to admit into evidence at trial investigator Douglas Wood's testimony and interview notes about Larry Grant's lineup photo identifications, on the ground they were excludible as Greene's attorney "work product." *See* Part II.B.3. The trial court denied Parks' post-verdict motion for a new trial, stating that, even if erroneous, the work product ruling had not influenced the verdict. We agree that the trial court ruling, though in error, was harmless.

Although the work-product privilege originated in the context of pretrial civil discovery, *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), it applies to criminal proceedings, *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975); *In re Sealed Case,* 219 U.S.App.D.C. 195, 676 F.2d 793, 810 (1982), and may be invoked during trial as well as pretrial.[28] Moreover, a defendant may invoke the privilege against a criminal codefendant, as well as against the government. This follows from the fact that codefendants' defenses commonly conflict to some extent, and under some circumstances each defendant may introduce evidence unfavorable to the other without requiring a severance. *See Ready v. United States,* D.C.App., 445 A.2d 982, 986 & n. 8 (1982). In order to encourage thorough investigation and preparation, therefore, the attorney's work product for one defendant must be protected against disclosure at the behest of a potentially adverse codefendant.[29]

The work-product doctrine, more specifically, creates a "qualified privilege" for materials prepared by an attorney (or attorney's agent) in anticipation of trial. *Nobles, supra,* 422 U.S. at 237–39, 95 S.Ct. at 2169–2170; Super.Ct.Civ.R. 26(b)(3).[30]

28. The Supreme Court stated in *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975): "[T]he concerns reflected in the work-product doctrine do not disappear once trial has begun. Disclosure of an attorney's efforts at trial, as surely as disclosure during pretrial discovery, could disrupt the orderly development and presentation of his case." In that case, however, the Court determined that the defense had waived any work-product right it might have had, and therefore found it unnecessary "to delineate the scope of the doctrine at trial ...." *Id.*

We do not address here any issue of pretrial discovery.

29. Although it has often been said that the work-product privilege exists to shield a party's preparation materials from his opponent, *see, e.g., Moody v. IRS,* 210 U.S.App.D.C. 80, 654 F.2d 795, 800 (1981); *United States v. AT & T,* 206 U.S.App.D.C. 317, 331, 642 F.2d 1285, 1298–99 (1980), the relationship between codefendants may be sufficiently "adversary" that they will be deterred from trial preparation if they cannot shield work product from each other. *See Coastal States Gas Corp. v. Dep't of Energy,* 199 U.S.App.D.C. 272, 282, 617 F.2d 854, 864 (1980) (without work-product protection, "[c]ertainly less work-product would be committed to paper, which might harm the quality of trial preparation").

30. Super.Ct.Civ.R. 26(b)(3) provides in relevant part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

"Initially, there must be a demonstration by the resisting party that the disputed material has in fact been prepared 'in anticipation of litigation or for trial,'" *SEC v. National Student Marketing Corp.*, 18 Fed.R. Serv.2d 1302, 1305 (D.D.C.1974) (*quoting* FED.R.CIV.P. 26(6)(3)); that is, the party must show that the material is "work product." *See United States v. AT & T*, 86 F.R.D. 603, Guideline No. 14 at 626 (D.D.C. 1979). "[T]he burden is then on the party opposing the privilege to establish reasons why the materials should be disclosed." *Id.*, Guideline No. 4, at 609.

The showing required to prevail against the privilege depends on whether the material sought is "fact work product" or "opinion work product." If the material is fact work product containing no mental impressions, conclusions, opinions, or legal theories of the attorney or attorney's agent, *see In re Doe*, 662 F.2d 1073, 1076 n. 2 (4th Cir. 1981), the party seeking access must show that he or she has a "substantial need" for the material and "is unable without undue hardship to obtain the substantial equivalent of the material by other means." FED.R.CIV.P. 26(b)(3); *AT & T, supra*, Guideline No. 17, at 631. If, however, the material sought is opinion work product containing "fruits of the attorney's [or agent's] mental processes," *In re Doe, supra* at 1076 n. 2, the party seeking production can overcome the work product privilege only with "a showing of extreme necessity." *AT & T, supra*, Guideline No. 18, at 632; *see Upjohn Co. v. United States*, 449 U.S. 383, 401–02, 101 S.Ct. 677, 688–689, 66 L.Ed.2d 584 (1981) (need for stronger showing of necessity than "substantial need"); *In re Sealed Case, supra*, at 811 (must show extraordinary necessity).

If the material sought is a combination of fact and opinion work product, the trial court should view the document *in camera* to determine what part is "fact" and what is "opinion." *See AT & T, supra*, Guideline No. 3, at 608. The court should then bifurcate its analysis, applying the appropriate standard ("substantial need" or "extreme necessity") to each part of the work product material. *In re Grand Jury Subpoena*, 524 F.Supp. 357, 361 (D.Md. 1981); *see Saunders v. United States*, 114 U.S.App.D.C. 345, 349–50, 316 F.2d 346, 350–51 (1963). If fact and opinion are blended, the court must apply the "extreme necessity" test to the material as a whole.

In the present case, the trial court erred in ruling that the work-product doctrine barred Wood's testimony. Facts learned during preparation for trial are not themselves work product, even if documents containing the same facts are. *See Hickman, supra* 329 U.S. at 504, 67 S.Ct. at 390; *Ford v. Phillips Electronic Instruments Co.*, 82 F.R.D. 359, 360 (E.D.Pa.1979); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2023, at 194 (1970); 4B MOORE'S FEDERAL PRACTICE ¶ 26.64[4] at 26–447 n. 15 (1981); Advisory Committee Notes on 1970 Amendments to Fed.R.Civ.P. 26(b)(3), 48 F.R.D. 487, 501.[31]

The question of Wood's notes is more complicated. The notes were work product, since they were documents created by the defense attorney's agent in anticipation of trial. *See Nobles, supra*, 422 U.S. at 237–39, 95 S.Ct. at 2169–2170. The trial court therefore should have examined them *in camera* to sort out factual content from opinion content. *See Saunders, supra*, 114 U.S.App.D.C. at 349–50, 316 F.2d at 350–51;

This rule is identical to the Fed.R.Civ.P. 26(b)(3), which codifies the Supreme Court's holding in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). *See Jordan v. United States Dep't of Justice*, 192 U.S.App. D.C. 144, 165, 591 F.2d 753, 774 (1978); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2023, at 193 (1970). The *Hickman* holding was applied to criminal cases in *Nobles, supra*, 422 U.S. at 236–39, 95 S.Ct. at 2169–2170. Rule 26(b)(3) therefore provides guidance in criminal, as well as civil, proceedings. *In re Sealed Case*, 219 U.S.App.D.C. 195, 676 F.2d 793, 808 (1982).

31. *Cf. Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933 (6th Cir. 1980) (work-product doctrine bars discovery of detailed description of privileged documents themselves); *Peterson v. United States*, 52 F.R.D. 317, 320 (S.D.Ill.1971) (same).

*AT & T, supra,* Guideline No. 3, at 608–609.[32] The notes may have consisted solely of Wood's opinions, in which case the court possibly could have excluded them—without reaching the work product exclusion issue—on the ground that the investigator's opinions, as such, were not admissible evidence. *See Nobles, supra,* 422 U.S. at 245–46 & n. 4, 95 S.Ct. at 2173–2174 & n. 4 (White, J., concurring) ("[M]ost of the material described by the [majority] as falling under the work-product umbrella does not qualify as evidence. A lawyer's mental impressions are almost never evidence ....")[33]

On the other hand, the notes may have contained facts which were admissible as evidence in Parks' case.[34] Where an attorney's work product, sought at trial, contains admissible evidentiary facts, the seeking party has, by definition, a "substantial need" for the material. FED.R.CIV.P. 26(b)(3). *See Nobles, supra,* 422 U.S. at 245, 95 S.Ct. at 2173 (White, J., concurring); *Hickman, supra,* 329 U.S. at 515, 67 S.Ct. at 395 (Jackson, J., concurring).[35] Moreover, if the facts are altogether mixed with opinion work product but nonetheless constitute admissible evidence (as determined by the court's *in camera* inspection), the "extreme necessity" test also will have been met, on the ground that a party is entitled to the benefit of each discrete evidentiary fact. *See Hickman, supra* at 511, 67 S.Ct. at 393–394; 8 C. WRIGHT & A. MILLER, *supra* § 2028, at 240. *But see* note 35 *supra.*[36] It follows that the trial court erred in excluding Wood's notes as evidence for Parks at trial, without making an *in camera* inspection to determine admissibility.

We agree, however, with the trial court's conclusion (in denying Parks' motion for a new trial) that any error in excluding

32. *But cf. In re Sealed Case, supra* at 814 & n. 83 (court not required "to make highly refined judgments" based on *in camera* inspections "perhaps concerning volumes of documents" in order to determine whether crime-fraud exception to work product doctrine applies).

33. An attorney's legal opinions may be evidence where his management of a case is the subject of litigation. *See, United States v. Amrep,* 418 F.Supp. 473 (S.D.N.Y.1976) (attorney's conduct at issue). *But cf. Goldberg v. United States,* 425 U.S. 94, 106, 96 S.Ct. 1338, 1346, 47 L.Ed.2d 603 (1976) (attorney's notes of interview recording only his own thoughts do not qualify at "statements" of a witness under Jencks Act); *Saunders v. United States,* 114 U.S.App.D.C. 345, 350, 316 F.2d 346, 351 (1963) (same).

34. Parks was not required to prove, in his proffer, that the notes contained facts as well as opinion. His specific request for the notes recording Wood's interviews with Grant was sufficient to trigger the court's obligation to review the notes *in camera. Cf. Jencks v. United States,* 353 U.S. 657, 667–69, 77 S.Ct. 1007, 1012–1013, 1 L.Ed.2d 1103 (1957) (defense need not show that prior statements of government witnesses are impeachment evidence in order to obtain those statements, since "the accused is helpless to know or discover conflict without inspecting the reports"); 8 C. WRIGHT & A. MILLER, *supra* § 2025, at 227–28 ("It is difficult to see how [a party] will be able to show as a fact that a statement contains impeaching matter if he has not seen the statement").

In this connection, the court and the parties had been alerted to the work product issue at the pretrial hearing. *See* note 19 *supra.* No party has made an argument that anyone was prejudiced by Parks' effort to obtain Woods' notes for the first time at trial.

35. The trial court, however, may exercise its discretion to exclude work product evidence if it finds, based on *in camera* inspection, that the evidence is wholly cumulative.

36. Although a party generally cannot obtain work product which includes a witness statement at the discovery stage, when it is not yet clear whether the statement (then hearsay) will be admissible as a prior inconsistent statement, *see Hickman, supra,* 329 U.S. at 513, 95 S.Ct. at 394–395; *Upjohn Co. v. United States,* 449 U.S. 383, 401–02, 101 S.Ct. 677, 688–689, 66 L.Ed.2d 584 (1981), this rule loses force at trial. *See also Nobles, supra,* 422 U.S. at 251–52 n. 12, 95 S.Ct. at 2176–2177 n. 12 (White, J., concurring).

While it is true that the prosecution may not obtain witness statements from the defense even after the witness has testified at trial, *Middleton v. United States,* D.C.App., 401 A.2d 109, 114–122 (1979) (Jencks Act, 18 U.S.C. § 3500, is not reciprocal; it requires prosecution to turn over prior statements of its witnesses to the defense but not the reverse); *United States v. Wright,* 160 U.S.App.D.C. 57, 65, 489 F.2d 1181, 1189 (1973) (same), that rule is inapplicable in this case, since a defendant is the seeking party.

Wood's notes and testimony was harmless. The court accurately noted in its Memorandum Opinion that Wood's testimony would have been "cumulative of the acknowledged misidentification," adding only "a scrap of impeachment" of Grant (on the question whether the photo was "snatched away" from him).

More specifically, the gist of Wood's proffered evidence already had been introduced into evidence—in Grant's own testimony on cross-examination. Grant then admitted that he picked No. 15, not No. 1 (Parks), every time Wood had shown him the lineup photo, and that he had considered No. 1 to be only "a maybe." According to Parks' proffer, Wood's testimony would not materially have differed from Grant's as to the person identified (No. 15). Wood—it is true—would have asserted that Grant did not articulate his feeling that Parks was "a maybe," and would have denied that he snatched the photo away from Grant. But even without Wood's evidence, the jurors were fully aware of Grant's equivocation. They knew that Grant had picked No. 15 rather than Parks at the Wood interviews (whether or not he termed Parks "a maybe") and that he had picked No. 15 the first time the police showed him the lineup photo. If they nonetheless chose to credit Grant's three positive identifications of Parks (from the lineup photo in November 1979, at the pretrial hearing, and at trial), Wood's testimony would not have detracted enough to alter this result. If, on the other hand, the jurors disbelieved Grant and relied on the testimony of Bedney and the other witnesses, Wood's evidence would not have affected the result, either.

Accordingly, we can say with fair assurance that "the judgment was not substantially swayed," *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946),[37] by the erroneous exclusion of this impeachment evidence.[38] Thus, the court's error in excluding Wood's notes under the work-product doctrine without *in camera* inspection, as well as the error in excluding Wood's testimony, does not permit reversal.[39]

## VIII. Prosecutorial Misconduct

Appellants allege that the trial court erred in denying their motions for a mistrial based on two statements by the prosecutor in his closing argument to the jury. First, the prosecutor compared the criminal justice system to a relay race:

> PROSECUTOR: Now, I often think of a criminal proceeding in an analogy of something like a relay race. That is, we first have an offense which is committed; the offense triggers action by the police, and investigation. The police seek to gather evidence. The police seek to interview witnesses, to determine what occurred. The police seek to determine whether they have probable cause to arrest anyone.
>
> If they make that determination, the police come to the courts where a judge reviews an arrest warrant, as was done in this case. When the persons are arrested, the race continues, so to speak.
>
> It then comes to the office of the United States Attorney where it is reviewed to determine the charges that will be presented in court and to the grand jury. And, in fact, charges are then taken be-

37. The *Kotteakos* standard is appropriate here, since the court's error did not infringe Parks' constitutional rights. *Compare Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (petitioner was deprived of a fair trial where testimony regarding confession of a third person was excluded as hearsay and petitioner was not allowed to cross-examine third person).

38. *See Cooper v. United States,* D.C.App., 353 A.2d 696, 704 (1976) ("the centrality of the issue affected by the error" is a major factor to be considered in determining harmlessness). *Cf. Strickland v. United States, supra* at 1327 (newly discovered impeaching evidence will not support a motion for a new trial unless credibility of witness may be determinative of guilt or innocence); *Huggins v. United States,* D.C. App., 333 A.2d 385, 387 (1975) (same).

39. We note that Detective Slawson testified at the pretrial hearing that Grant told him he had identified only two persons from the lineup photo during the first Wood interview. Parks could have impeached Grant by questioning Slawson on this point at trial, but did not do so.

fore the grand jury who considers the testimony—

THE COURT: Let's stick to the evidence in this case.

PROSECUTOR: I plan to, Your Honor.

THE COURT: Get to it then.

PROSECUTOR: Thank you, Your Honor. And the grand jury returns an indictment such as the indictment we have in this case.

The indictment in this case charges seven separate and distinct offenses. When this indictment was returned—and, of course, the Judge has instructed you and will instruct you again that this indictment is not evidence. When this indictment was returned, the defendants pled not guilty to the charges in the indictment. They demanded, and they have received a trial by a jury of their peers. You, ladies and gentlemen. You have been selected by both defense counsel and myself as the 12 people most capable of rendering a fair and impartial verdict. The baton, so to speak, has been passed to you.

According to appellants, this relay race analogy improperly suggested that the government would not have brought them to trial if they were not guilty.[40]

Second, in his rebuttal argument, the prosecutor commented on his attempt to impeach Rosetta Ross:

PROSECUTOR: Now, Rosetta Ross said she was at Dr. Dixon's office with Rositta. Rosetta Ross says, "I don't even know what they were talking about. I heard Mary say—Mary was arguing with Rositta. I got up and walked across the room. Just as I walked across the room I heard Mary say, "Tell the family to give me $3000 and I will turn him loose."

Turn who loose? Who was she talking about? And where is Rositta? Why didn't Rositta get on the stand since she was the one talking directly with Mary?

No, Rosetta said, "I am not the one that was convicted of robbery. It was my daughter, Rositta." Is there any doubt in your mind why Rositta didn't get on the stand and tell you first-hand?

Asserting that this constituted an improper "missing witness" argument, appellants moved for a mistrial after the court had instructed the jury. Appellants rejected the court's suggestion that they propose curative instructions. The trial court took the motion under advisement and denied it at a post-trial hearing.[41]

In cases of alleged prosecutorial misconduct, the factors to be considered in evaluating a mistrial motion are: "(1) the gravity of the misconduct, (2) the relative strength of the government's evidence, (3) the centrality of the issue affected (its di-

**40.** Appellants did not object to the "relay race" argument when it was made but included it in their memorandum in support of the post-verdict motion for a mistrial.

**41.** The court ruled as follows:

The Court finds that the matters which are brought to its attention are indeed instances of prosecutorial misconduct.

The Court, however, must determine whether or not that misconduct affected the verdict. The Court concludes that it did not.

We are speaking in the major part about a few minutes of argument in the context of 7 days of trial. We are talking about that argument in the context of a case that was vigorously defended.

We are not talking about that argument in a case where it alone would have made the difference.

The Court views somewhat differently than counsel the effect and impact of the alleged offer to receive $3,000.00 in exchange for dropping one of the codefendants from the case.

As the Court listened to the case it did view that as significant. It appears to the Court that this case focuses on Mary Bedney who may or may not have made such an arrangement which in the Court's view would not be inconsistent with her lifestyle.

Even with that remark I think that the jury could focus on whether or not on the evening in question she, in fact, saw that she did and was able to make the identification and that identification was, indeed, the central issue, and that she was thoroughly examined on her capacity to do that—on her possible mistake. Her capacity to remember and to observe was fully tested ... and the Court feels confident that the jury was focused on whether or not Mary Bedney was telling the truth.

rect relationship to the issue of guilt or innocence), and (4) the mitigating efforts that were made." *Johnson v. United States,* D.C.App., 386 A.2d 710, 713 (1978) (citations omitted); *see Villacres v. United States,* D.C.App., 357 A.2d 423, 428 (1976); *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). "In addition [to these factors], the opinion of the trial judge is entitled to some reliance since only [s]he had the opportunity to appraise the effect of the remarks in their setting." *Jenkins v. United States,* D.C. App., 374 A.2d 581, 585 (citation omitted), *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977); *see Smith v. United States,* D.C.App., 315 A.2d 163, 167, *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).[42]

A. *The "Relay Race" Comment*

In arguing to the jury, attorneys should "concentrate on facts, issues and evidence," and eschew such "irrelevancies" as the relay race analogy used by the prosecutor here. *Harris v. United States,* 131 U.S. App.D.C. 105, 108, 402 F.2d 656, 659 (1968); *see Fernandez v. United States,* D.C.App., 375 A.2d 484, 486 (1977). Under the case law of this jurisdiction, however, the relay race analogy cannot be considered grave misconduct. Our reversals of convictions for prosecutorial misconduct have typically reflected much more serious lapses.[43]

In cases where, as here, the prosecutor has argued in effect that the jurors could best "do their duty" by voting to convict, we have concluded that such remarks were not prejudicial. *Id.* at 486 (no prejudicial misconduct where prosecutor argued that, upon recognizing their "civic obligation" as "community representatives," jurors would vote to convict); *Smith, supra* at 166–67 (no prejudicial misconduct where prosecutor argued "that a guilty verdict would be a matter of achievement and courage"); *accord United States v. Hawkins,* 193 U.S. App.D.C. 366, 369 & n. 10, 595 F.2d 751, 754 & n. 10 (1978) (per curiam), *cert. denied,* 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979) (no prejudicial misconduct resulted where prosecutor implied that community was relying on jury to convict drug dealers, saying, "We did something about [the drug problem]. All we can do is to bring it to you and turn it over in your hands"). *But see United States v. Cummings,* 468 F.2d 274, 277–78 (9th Cir. 1972) (misconduct was prejudicial where prosecutor commented that the case had reached the jury through system of "checks and balances," only after police, prosecutors, and the grand jury had all concluded that "in fact a violation ha[d] occurred" and that the case "should go forward").[44]

42. Appellants contend on appeal that the prosecutor also engaged in prejudicial misconduct by describing the victims' wounds in an inflammatory manner, implying that defense counsel suborned perjury, misstating evidence, and "belittl[ing]" defense theories. After reviewing the record, we conclude that these contentions do not merit discussion.

43. *Compare Dyson v. United States,* D.C.App., 418 A.2d 127 (1980) (conviction reversed after repeated statements that all defense witnesses lied, suggestion that defendant fabricated his testimony based on that of other witnesses, unauthorized argument regarding missing alibi witnesses) *and Villacres v. United States,* D.C. App., 357 A.2d 423 (1976) (conviction reversed after repeated misstatements of evidence—including comments on inadmissible confession, unfounded allegation that defendant had instructed his mother to suppress evidence, and argument that crime was comparable to crucifixion of Christ) *with Miles v. United States,* D.C.App., 374 A.2d 278, 283–84 (1977) (no prejudicial misconduct resulted where prosecution, in arguing unreliability of character evidence, pointed out that Judas Iscariot and Benedict Arnold once enjoyed good reputations).

44. The holding in *Cummings* apparently was unprecedented. The cases relied upon by the Ninth Circuit, *id.* at 278, involved multiple instances of misconduct. *See Hall v. United States,* 419 F.2d 582 (5th Cir. 1969) (prejudice found where prosecutor's statement that "we try to prosecute only the guilty" was combined with baseless charge of witness tampering against defendant, statement of opinion of disputed fact issue, and description of defendant as a "hoodlum"); *McMillian v. United States,* 363 F.2d 165 (5th Cir. 1966) (prejudice found where erroneously admitted hearsay evidence "insinuat[ed] that the government had additional information by way of a reliable informer" and prosecutors told jurors that police had "to convince our office that they've got a case" and that "there's all kinds of rulings the Court makes before you get [the case]").

Furthermore, the "relay race" comment did not bear on a central issue in the case. Nor was it inflammatory. *Compare Villacres, supra* at 427–28; *United States v. Phillips,* 155 U.S.App.D.C. 93, 476 F.2d 538 (1973) (per curiam). And, unlike misstatements of evidence or accusations of perjury, this rhetorical comment bore no "direct relationship" to the issue of guilt or innocence. *Compare Dyson v. United States,* D.C.App., 418 A.2d 127, 132 (1980) (statements that defense witnesses lied were prejudicial where "jury's assessment of the believability of either version was dispositive of its finding of guilt or innocence"); *Villacres, supra* at 427 (comments on inadmissible "confession" were prejudicial); *Corley v. United States,* 124 U.S.App.D.C. 351, 352, 365 F.2d 884, 885 (1966) (misstatements of evidence were prejudicial where they "made the difference between a strong alibi and no alibi").

The government's case against appellants, moreover, was strong. There was an eyewitness to the crimes (Bedney) and an independent identification witness (Grant). Although appellants contend that the testimony of these two witnesses was open to doubt, both witnesses made several positive identifications of each appellant. *Compare Jenkins, supra* at 583–85 (misconduct not prejudicial where, government's case, including eyewitness testimony, "was very strong") *with Dyson, supra* at 132 (misconduct prejudicial where "government's case consisted entirely of circumstantial evidence").

In addition, any harm caused by the "relay race" comment was somewhat mitigated by the fact that the trial judge interrupted the prosecutor in mid-argument, cautioning him to "stick to the evidence." And, at the end of closing arguments, the trial court instructed the jury that statements of counsel are not evidence and that the defendants must be presumed innocent. While general instructions do not automatically blot out prejudice in every case, they are "an ameliorative factor deserving of some consideration." *Hawkins, supra* at 370, 595 F.2d at 755; *see Bates v. United States,* D.C.App., 403 A.2d 1159, 1163 (1979); *Fernandez, supra* at 486; *Jenkins, supra* at 585.

Furthermore, the relay race remark was contained in a one-hour-and-fifteen-minute argument which consisted almost entirely of factual review. *Compare* authority cited in *Fernandez, supra* at 486 (misconduct is prejudicial where prosecutor "ignore[s] altogether the evidence" and argues generalities).

Finally, appellants themselves apparently attached little importance to the relay race argument at the time it was made. They did not object immediately, nor did they object during post-verdict argument when they called the "missing witness" argument to the court's attention. They first raised the issue in a post-verdict memorandum filed in support of the mistrial motion. *See* note 40 *supra.* Although a failure to object promptly is not dispositive of the issue of prejudice, *United States v. (Wilbur) Jones,* 157 U.S.App.D.C. 158, 165, 482 F.2d 747, 754 (1973); *United States v. Young,* 150 U.S.App.D.C. 98, 104, 463 F.2d 934, 940 (1972); *United States v. Briggs,* 457 F.2d 908, 911–12 (2d Cir.), *cert. denied,* 409 U.S. 986, 93 S.Ct. 337, 34 L.Ed.2d 251 (1972), it constitutes some evidence that appellants did not immediately perceive the challenged argument as prejudicial. *See Brown v. United States,* D.C.App., 383 A.2d 1082, 1085 (1978) (considering promptness of objection in determining prejudice). *Cf. Cohoon v. United States,* D.C.App., 387 A.2d 1098, 1100–01 (1978) (applying "plain error" standard in absence of objection at trial); *Young, supra,* 150 U.S.App.D.C. at 105, 463 F.2d at 941 (same); *United States v. Briggs, supra* at 912 (same).[45]

45. Although the trial court did not refer explicitly to the relay race argument in denying appellants' motion, the court's expressed opinion (after consideration of appellants' briefs, which discussed this argument) that there was no misconduct necessitating a mistrial is entitled to some reliance. *See Jenkins v. United States,* D.C.App., 374 A.2d 581, 585, *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977); *Smith v. United States,* D.C.App., 315 A.2d 163, 167, *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).

B. *The "Missing Witness" Comment*

Before counsel may make a "missing witness argument," inviting the jury to infer that, if the witness had been produced, his or her testimony would have been unfavorable to the other party, counsel must seek permission from the court, and the court must determine that the witness in question (1) is peculiarly available to the other party and (2) would give testimony elucidating the transaction at issue. *Simmons v. United States,* D.C.App., 444 A.2d 962, 964 (1982); *Dent v. United States,* D.C. App., 404 A.2d 165, 169–70 (1979); *see Givens v. United States,* D.C.App., 385 A.2d 24, 26 (1978). If both criteria are met, the court may give leave to make the argument. *See Dent, supra* at 169–70; *Givens, supra* at 26. *See also Cooper v. United States,* D.C.App., 415 A.2d 528, 532–35 (1980) (trial court may give instruction allowing adverse inference only if same criteria are satisfied); *Coombs v. United States,* D.C.App., 399 A.2d 1313, 1316 (1979) (same).[46]

The prosecutor's failure to seek court permission for a "missing witness" argument here, however, did not constitute grave misconduct since he commented on Rositta Ross's absence but "did not directly urge the jury to draw from the fact [of absence] an inference adverse to appellant." *Fletcher v. United States,* D.C.App., 335 A.2d 248, 250 (1975) (per curiam) (citations omitted).[47] Counsel sometimes are granted leave to make incomplete "missing witness" arguments, (*i.e.,* merely to comment on the absence of a witness) *if* they agree not to ask the jury to infer that the missing witness testimony would have been adverse to the party failing to call that witness. *See Burgess v. United States,* 142 U.S.App.D.C. 198, 207, 440 F.2d 226, 235 (1970) ("Counsel should not be precluded from all comment [on a witness' absence], though he is not authorized to go so far as to argue that the testimony would be unfavorable").[48] Even when viewed as questionable, moreover, such arguments generally have been held not to constitute prejudicial error. *Harvey v. United States,* D.C.App., 395 A.2d 92, 98 (1978), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979); *see Fleming v. United States,* D.C.App., 310 A.2d 214, 220 (1973); *Conyers v. United States,* D.C.App., 309 A.2d 309, 313 (1973). In any event, repetition is an important factor in determining the gravity of such misconduct, *compare Dent, supra* at 172 (misconduct prejudicial where argument was repeated) *with Young, supra,* 150 U.S.App.D.C. at 104, 463 F.2d at 940 (misconduct not prejudicial where there was no repetition causing harm to "cumulate"). The statement at issue here was the prosecutor's only reference to a "missing witness."

The missing witness argument, moreover, did not bear directly on the issue of appellants' guilt. The argument went to the credibility of the eyewitness, Mary Bedney.[49] Although credibility of identification

**46.** Not having sought the court's approval of his comments, the prosecutor obviously did not make the necessary showing that Rositta Ross was unavailable to be called as a witness by the government, *see Coombs v. United States,* D.C. App., 399 A.2d 1313, 1317 (1919), or that her testimony would be elucidating rather than merely cumulative of her mother's evidence. *See Cooper v. United States,* D.C.App., 415 A.2d 528, 534 (1980). *See also Simmons v. United States,* D.C.App., 444 A.2d 962, 964 (1982).

**47.** In fact, the prosecutor's remarks appear to have been intended less to convince the jury that Rositta Ross's testimony would have been adverse to appellants than to persuade the jury that Rosetta Ross was untrustworthy because of her association with her daughter, Rositta, a convicted felon, and to alert the jury that defense counsel had not called Rositta Ross because she could have been impeached. Even so, this was improper argument, since "it is . . . incumbent on counsel to confine his remarks in summation to facts which are in evidence and the reasonable inference therefrom." *Jones, supra,* 157 U.S.App.D.C. at 164, 482 F.2d at 753 (footnote omitted).

**48.** *But see United States v. Young,* 150 U.S. App.D.C. 98, 107 n. 16, 463 F.2d 934, 943 n. 16 (1971) (questioning this portion of the *Burgess* opinion); *Conyers v. United States,* D.C.App., 309 A.2d 309, 313 (citing *Young* with approval) (1973).

**49.** We agree with the trial court that the jurors need not necessarily have disbelieved Bedney's identifications even if they had credited Rosetta

testimony is an important issue, cases of reversible error based on a missing witness argument or instruction typically have concerned the defendant's own credibility. *See Simmons, supra* (in gun possession case, "missing" witness allegedly was with defendant in car where gun was found); *Dent, supra* at 172 ("missing" alibi witnesses); *Coombs, supra* at 1315, 1316 n. 7 (same); *Givens v. United States, supra* at 28 ("missing" eyewitness to crime).[50]

Finally, the trial court's instruction to the jury at the end of the missing witness argument mitigated the adverse inference to be drawn from the prosecutor's rhetorical question: "Why didn't Rositta get on the stand?" The prosecutor ended his missing witness comments by stating that "Mary Bedney didn't lie" but that "the witnesses put up by [defense counsel] lied." The court interrupted to tell the jury: "[Y]ou will disregard counsel's characterization of who was telling the truth and who was not. It's for you to make that determination." There was, moreover, "no missing witness instruction given by the trial court to compound the effect of the prosecutor's comments," *Conyers, supra* at 314, by lending them "the weight of law." *Young, supra,* 150 U.S.App.D.C. at 107, 463 F.2d at 943; *see Burgess v. United States,* 142 U.S.App. D.C. 198, 207, 440 F.2d 226, 235 (1970). *Compare Givens, supra* at 28 (trial court's overruling of defense objection "inevitably had the effect of enhancing the government's position and weakening that of the defense").[51]

As we have noted, the evidence against appellants was strong. Moreover, in denying appellant's motion for a mistrial, the trial court noted that the missing witness argument made up only "a few minutes" in a week-long trial, *see Bates, supra* at 1163, and that the case was "vigorously defended." *See Jenkins, supra* at 585 (according significance to trial court's finding that

"both counsel fought the case hard" and that "the jury, having heard both sides of the case, would be able to render a fair verdict"); *Smith, supra* at 167 (noting that "during the trial [an identification witness'] credibility and powers of recollection were fully tested throughout lengthy direct and cross-examination" and therefore that the evidence, if believed, was strong). The trial court's judgment on this issue should be given significant weight. *See Jenkins, supra* at 585; *Smith, supra* at 167.

For all these reasons, we can say with confidence that neither the relay race analogy nor the missing witness argument substantially swayed the jury's verdict. *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. Since we have concluded that the trial court did not commit reversible error in any other respect, appellants' convictions are affirmed.

*Affirmed.*

---

Ross's testimony: they could have concluded that Bedney was willing, for a price, to "free" one of her assailants.

**50.** *Cf. Jenkins, supra* at 585 (misconduct not prejudicial, given strength of government's

case, even where issue affected was defendant's credibility).

**51.** The standard "missing witness" instruction is CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.41 (3d ed. 1978).